# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 03-3238, 03-3347, 03-3370,
03-3428, 03-3467 & 03-3617

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

WILLIAM C. GRAY, FREDERICK H. LENOVER,
TONYA F. WOLFE, OSCAR MCGRAW, WALTER
DUREGGER, JR., and TONY P. MCMILLIN,

*Defendants-Appellants.*

———————

Appeals from the United States District Court for the
Southern District of Indiana, Terre Haute Division.
No. TH 02-18-CR-M/L—**Larry J. McKinney**, *Chief Judge.*

———————

ARGUED FEBRUARY 24, 2005—DECIDED MAY 23, 2005

———————

Before FLAUM, *Chief Judge*, and MANION and EVANS,
*Circuit Judges.*

EVANS, *Circuit Judge.* Before us in this appeal are 6 of 15
defendants, many high-ranking members of the Diablos
Motorcycle Club (DMC), who were charged with and con-
victed of being members of a methamphetamine conspiracy
in the Southern District of Indiana. William Gray, Frederick

Lenover, Tonya Wolfe, Oscar McGraw, and Tony McMillin (he was also convicted on several related charges, two involving firearms) were convicted by a jury; Walter DuRegger entered a guilty plea to the conspiracy charge. They appeal, raising a bevy of trial and sentencing issues.

A very brief overview of the evidence, viewed in the light most favorable to the government, shows that a conspiracy to distribute methamphetamine[1] was formed in 2001 when

---

[1] We are seeing more and more cases involving methamphetamine. In a lengthy article ("My Addicted Son") in the February 6, 2005, edition of the *New York Times* magazine, the author (David Sheff) describes, in chilling detail, his only encounter with this extremely nasty drug:

> I snorted the lines through a rolled-up dollar bill. The chemical burned my nasal passages, and my eyes watered. Whether the drug is sniffed, smoked, swallowed or injected, the body quickly absorbs methamphetamine. Once it reaches the circulatory system, it's a near-instant flume ride to the central nervous system. When it reached mine, I heard cacophonous music like a calliope and felt as if Roman candles had been lighted inside my skull. Methamphetamine triggers the brain's neurotransmitters, particularly dopamine, which spray like bullets from a gangster's tommy gun. The drug destroys the receptors and as a result may, over time, permanently reduce dopamine levels, sometimes leading to symptoms normally associated with Parkinson's disease like tremors and muscle twitches. Meth increases the heart rate and blood pressure and can cause irreversible damage to blood vessels in the brain, which can lead to strokes. It can also cause arrhythmia and cardiovascular collapse, possibly leading to death. But I felt fantastic—supremely confident, euphoric.

> After methamphetamine triggers the release of neurotransmitters, it blocks their reuptake back into their storage pouches, much as cocaine and other stimulants do. Unlike cocaine, however, meth also blocks the enzymes that help to break

(continued...)

Sam Hargrove and Gray, who were Californians, met McGraw at a DMC meeting in Indiana. McGraw asked Hargrove to supply him with methamphetamine. After the meeting, Hargrove and Gray returned to California, where Hargrove contacted a methamphetamine source who fronted him five pounds of the drug. Hargrove and Gray concealed the methamphetamine in a trailer hitch and shipped it to Indiana. At some point, the volume of methamphetamine increased, sometimes to 20 pounds per shipment, which required a different (and bigger) hiding place. Hargrove and Gray turned to concealing the methamphetamine in nerf bars, which are running boards that attach to pickup trucks. What ordinarily happened was that codefendant John Durnin and Gray bought nerf bars, which they took to Hargrove's residence. Hargrove obtained the methamphetamine and Hargrove, Durnin, and Gray cut it with dimethylsulfone, creating 20 pounds of product, which they vacuum-sealed into one-pound packages. These packages were placed in the nerf bars, which Durnin welded shut. The nerf bars then were placed into a package for mailing to either County Line Auto in Center Point, Indiana, or to an address in Vincennes, Indiana. The shipments were made by this method approximately twice a month—that is, until law enforcement agents intercepted a shipment in May 2002.

After that setback, Hargrove and McGraw met in Las Vegas, Nevada, to discuss alternate methods for shipment. They decided that Hargrove would conceal the meth-

---

[1] (...continued)

down invasive drugs, so the released chemicals float freely until they wear off. Methamphetamine remains active for 10 to 12 hours, compared with 45 minutes for cocaine. When the dawn began to seep through the cracked window blinds, I felt bleak, depleted and agitated. I went to bed and eventually slept for a full day, blowing off school.

amphetamine in air compressors and ship them to Indiana via heavy freight. They also decided to begin communicating more by e-mail than by telephone.

In Indiana, once the drugs arrived, Daniel Cheshire recovered the methamphetamine from its hiding place. McGraw, who directed the operation in Indiana, established the price for the methamphetamine and directed Cheshire to deliver specific quantities to specific individuals, who in turn sold the drugs.

Throughout the conspiracy, the DMC had a chapter in Terre Haute, Indiana. McGraw was the national president of the club. Hargrove and Gray joined the San Fernando, California, chapter in 1993. They became acquainted with McGraw through the club. McGraw and Lenover, who was president of the Indiana chapter, sponsored Donald Osborn for membership in May 2001. McMillin was treasurer of the Indiana chapter and he, McGraw, and Lenover obtained money to pay their dues through selling methamphetamine.

As a result of an investigation into these activities, the defendants before us were indicted of conspiracy to possess with the intent to distribute and of distribution in excess of 500 grams of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 856. McMillin was also charged in a substantive distribution count and with the possession of a firearm during a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(A)(I). DuRegger pled guilty to the conspiracy count and the others were convicted by a jury of all the charges. McGraw and Gray were sentenced to life imprisonment, Lenover to 350 months imprisonment, Wolfe to 324 months, and McMillin to an aggregate sentence of 295 months. DuRegger drew a term of 210 months.

The defendants raise a number of issues on appeal. They contend that the district judge abused his discretion in finding that the affidavit submitted in support of an application for wire surveillance satisfied the necessity requirement of

18 U.S.C. § 2518(1)(c) and (3)(c). They also raise a number of evidentiary errors. They contend the district court abused its discretion in admitting evidence of membership in the DMC, in admitting their photographs (and photographs of their coconspirators) and allowing them to be on continuous display, in admitting firearms into evidence and permitting them to be on continuous display, and in admitting copies of the court order authorizing wire surveillance. They also contend that the court abused its discretion in prohibiting them from attempting to impeach Hargrove's testimony (he cooperated with the government) with evidence of a perjury conviction. And they contend that it was error to allow Special Agent Douglas Freyberger to testify as an expert on the identification and interpretation of drug code language. McMillin contends that the fruits of a search warrant executed at his home on June 26, 2002, should have been suppressed. Finally, Lenover, Wolfe, McGraw, DuRegger, and McMillin raise issues relating to their sentences.

We will turn first to the challenge to the affidavit submitted in support of the application for wire surveillance. The defendants argue that the evidence obtained from the surveillance should have been suppressed because the government failed to establish the "necessity" for the wire surveillance. We review a challenge to the necessity of wire surveillance under an abuse of discretion standard, granting substantial deference to the determination made by the district court. *United States v. Zambrana*, 841 F.2d 1320 (7th Cir. 1988).

Under 18 U.S.C. § 2518(1)(c), each application for wire surveillance must contain a "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous[.]" The government need demonstrate only one of the three alternatives. *United States v. Ceballos*, 302 F.3d 679 (7th Cir. 2002). The burden of establishing necessity is "not great,"

and we must review the government's compliance with the necessity requirement in a "practical and common-sense fashion." *Ceballos*, 302 F.3d at 683 (quoting *United States v. Zambrana*, 841 F.2d 1320, 1329 (7th Cir. 1988)).

The affidavit in this case addressed the necessity requirement and the use of alternative law enforcement techniques, including the use of confidential sources and undercover agents, grand jury investigations, search warrants, pen register and telephone records, and physical surveillance. It stated that the United States Drug Enforcement Administration (DEA) tried to use confidential informants, but they failed to provide the information needed and it appeared unlikely that they would succeed in the future. Confidential Informant #1 (CI1) refused to testify because he was afraid that McGraw would arrange to have him killed if he did. Further, he could not provide current information because he was incarcerated in another state. These facts help establish necessity. *See United States v. Anderson*, 542 F.2d 428 (7th Cir. 1976); *United States v. Thompson*, 944 F.2d 1331 (7th Cir. 1991). Confidential Informant #2 (CI2) could not provide information concerning the full scope of McGraw's drug trafficking because he could not identify the methamphetamine source, the couriers, or the customers, again facts going to necessity. *See Ceballos*. Consistent with *United States v. Zambrana*, 841 F.2d 1320 (7th Cir. 1988), the affidavit also noted that an undercover agent was unlikely to be able to infiltrate the organization because of the insular nature of motorcycle gangs in general and McGraw's organization in particular. As to grand jury testimony, the affidavit indicated that the dealers would likely invoke their Fifth Amendment rights if subpoenaed.

The affidavit also stated that the DEA and other law enforcement agencies attempted to execute search warrants but that these also failed to achieve the goals of the investigation. The DEA had not identified any locations where

they could search for methamphetamine or money, and it lacked a source of information about the arrival of methamphetamine in Indiana. A search warrant would also alert the conspirators of the investigation. As in *Zambrana*, the inability to conduct searches helps support a finding of necessity. Pen registers merely confirmed a contact between two telephones and could not identify the persons talking or the nature of the conversations. *See Ceballos*. Physical surveillance was ruled out because Cheshire's residence, where the methamphetamine was distributed to the dealers, was in an isolated location and also was protected with countersurveillance equipment. The difficulty of surveillance also supports necessity. *See United States v. Farmer*, 924 F.2d 647 (7th Cir. 1991). Considering all these allegations, the affidavit supporting the application was more than adequate for a finding of necessity for wire surveillance.

Next, we consider McMillin's contention that the district court should have granted his motion to suppress evidence obtained during a 2002 search of his home. When reviewing a ruling on a motion to suppress, we review questions of law *de novo* and questions of fact for clear error. *United States v. Liss*, 103 F.3d 617 (7th Cir. 1997). McMillin argues that the affidavit in support of the warrant did not contain sufficient evidence—apart from evidence obtained during an invalid 2001 search—to support a finding of probable cause. We disagree.

The government acknowledges that if the 2002 affidavit contained no facts arising after the earlier search, then there would be no probable cause for the search and no good faith on which the officers could rely. But the affidavit supporting the 2002 warrant contains information subsequent to the 2001 search. A search warrant obtained, in part, with evidence which is tainted can still support a search if the "untainted information, considered by itself, establishes probable cause for the warrant to issue." *United States v.*

*Oakley*, 944 F.2d 384, 386 (7th Cir. 1991). The connection with the unlawful search must be "so attenuated as to dissipate the taint." *Murray v. United States*, 487 U.S. 533, 537 (1988) (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)). In assessing whether the results of the subsequent search must be suppressed, we ordinarily consider whether the illegally obtained evidence affected the magistrate's decision to issue the warrant and, secondly, whether the agent's decision to obtain a warrant was prompted by knowledge of the results of the earlier illegal search. *United States v. Markling*, 7 F.3d 1309 (7th Cir. 1993); *see also United States v. Real Prop. at 15324 County Hwy. E.*, 332 F.3d 1070 (7th Cir. 2003). In the present case, while McMillan cites the two-part test, he argues only that "[s]etting aside the information gained from the unconstitutional entry, the Affidavit failed to contain sufficient credible information to justify the issuance of the Warrant." Because McMillin does not contend that the first search prompted Agent Freyberger to seek the second warrant, we will consider only the first prong of the inquiry—whether the illegally obtained evidence affected the magistrate's decision. As always, the determination of probable cause involves a "practical, common-sense decision whether, given all the circumstances set forth . . . , there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

The government relies on three primary categories of new information. The first is information obtained from CI1 that McMillin was a member of the DMC and was involved in ongoing methamphetamine trafficking for McGraw at his residence. Secondly, there is the June 2002 intercepted conversation between McMillin and "Amanda" in which McMillin attempted to establish a meeting with McGraw to discuss their drug trafficking activity. The government acknowledges that the conversation could be subject to various interpretations but argues that, given the totality

of circumstances and that drugs were seized after similar conversations between other conspirators, it—taken with other facts—offers support for a finding of probable cause. We agree.

Finally, there is information that McGraw purchased vehicles with drug proceeds and titled them under his business name, S&S Engineering. In June 2002, DEA agents observed a Cadillac registered to S&S Engineering parked on top of a transport trailer in McMillin's front yard. Looking at the totality of the circumstances, we find there is probable cause to support the warrant.

We will now turn to evidentiary issues. We review challenges to the admission of evidence only for an abuse of discretion. *United States v. Souffront*, 338 F.3d 809 (7th Cir. 2003).

Taking the easy issues first, we note that the judge did not abuse his discretion in admitting photographs of the defendants and allowing them to be displayed during the trial. The photos were admittedly used to allow the jury to remember who the conspirators were, but that, by itself, does not make them prejudicial. The defendants also say that the photos were less than flattering. That may be, but they were not mug shots and did not suggest that the conspirators were incarcerated.

Similarly, we see no abuse of discretion in the display of the firearms seized. We have previously ruled that firearms are often tools of the narcotics trade. *United States v. Alvarez*, 860 F.2d 801 (7th Cir. 1988). They were relevant to the charges. It is true that firearms probably riveted the jury's attention, but there is no rule that particularly strong evidence must be hidden.

The defendants object to admission of membership in the DMC. We first note that the government consistently referred to the DMC as a club, not as a gang, thus eliminating some of the implications which could be drawn about the

group. Furthermore, the government did not proceed with a theory that the club itself was distributing drugs. The danger of a jury finding guilt by association is minimized if the government does not substitute evidence of gang membership for proof that the defendants—as individuals—participated in the drug distribution network. Here the club evidence was used to show how some of the members knew each other and how it came about that shipments were made from California to Indiana. Given that club membership played an important role in the distribution network, we see no abuse of discretion in references to DMC membership. *See United States v. Thomas*, 86 F.3d 647 (7th Cir. 1996).

Defendants also object to the admission of district court orders authorizing wire surveillance. Their objection in this court is that the evidence is not relevant, it is hearsay, and that pursuant to Federal Rule of Evidence 403, its probative value is outweighed by its prejudicial effect. While this claim may have more substance than their other claims regarding the admission of evidence, the objection was not preserved in the trial court. At trial, the defendants had a continuing objection to testimony about the wiretaps and information gleaned from the surveillance. Mr. McGraw's attorney stated the objection: "I would like to make an objection to this question and any further questions concerning the wiretap intercepts on the grounds that the wiretap in this case was violative of 18 U.S.C. Section 2518 and my client's rights under the 4th Amendment of the Constitution . . . ." When the wiretap orders themselves were introduced, counsel said, "Same objection made under 18 U.S.C. 2518 and the 4th Amendment." The objection, as stated, went only to the propriety of the seizures; it was not that the orders themselves were prejudicial, irrelevant, or contained hearsay. In short, the objection did not provide the court with the nature of the objection "so as to alert [the judge] to the proper course of action and enable opposing counsel to take proper corrective measures." Fed. R. Evid. 103 advi-

sory committee's note. Therefore, our review on this issue is conducted only under the rigorous plain-error standard.

As outlined in *United States v. Olano*, 507 U.S. 725, 732 (1993), before an appellate court can correct an error not raised at trial there must be (1) "error," (2) that is "plain," and (3) that "affect[s] substantial rights." If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *United States v. Atkinson*, 297 U.S. 157, 160 (1936); *Olano*. The last criterion is often described as an error which causes a "miscarriage of justice." *United States v. Frady*, 456 U.S. 152, 163 n.14 (1982); *see also United States v. Lechuga*, 994 F.2d 346 (7th Cir. 1993).

Using the plain-error standard, we reject, without comment, the defendants' hearsay and relevance objections. However, the objection pursuant to Rule 403 of the Federal Rules of Evidence requires more attention. The issue is whether the probative value of the orders "is substantially outweighed by the danger of unfair prejudice . . . ." The orders were presented, the government says, to assure the jury that the wiretaps were legal and to allay any fears about illegal surveillance.

Even were it necessary to show the jury that the wiretaps were legal, the admission of the orders is troublesome. The orders state that there is probable cause to believe that the conspirators (who are named) "have committed, and are committing, and will continue to commit violations of offenses involving the receiving, concealment, buying, selling or otherwise dealing in narcotic or other dangerous drugs . . . ." The risk of prejudice in revealing that information to the jury is real. Furthermore, there are other less prejudicial ways to establish the legality of the wiretaps—a stipulation, for instance, which would not reveal the exact findings on which the orders were based (which could have been done had a clear objection been made to the evidence).

But all we need decide in this case is whether admission of the evidence constitutes plain error. Even were we to find error that is plain, we could not find that the passing reference to the orders affected either the substantial rights of the defendants or the fairness or integrity of the judicial proceedings. There was much more dramatic evidence of the guilt of the defendants. The admission of the orders is not so egregious as to affect the fairness of the proceedings. We reject the contention that the admission of the orders rises to the level of plain error.

The defendants also claim they should have been allowed to impeach Hargrove with evidence of his 12-year-old perjury conviction. On this issue our review is for an abuse of discretion.

Federal Rule of Evidence 609(a) provides that evidence of convictions for crimes punishable by death or imprisonment for more than one year is admissible if the court determines "that the probative value . . . outweighs its prejudicial effect to the accused[.]" Rule 609(b) places a time limit on the evidence: "Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction . . . unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect."

The defendants argue that the impeachment value of a perjury conviction can hardly be overstated. That may sometimes be true. However, the perjury involved in Hargrove's case did not involve prior court testimony, but rather a statement made on an application for a California driver's license. Furthermore, the defendants were allowed to impeach Hargrove with four serious felony convictions, including convictions for possession of methamphetamine, for possession of a dangerous weapon, and for committing an offense while he was on parole. We cannot say that the

judge abused his discretion by failing to admit the testimony of the stale perjury conviction.

The final trial error which the defendants raise involves the testimony of Special Agent Douglas Freyberger in his capacity as an expert on the identification and interpretation of drug code language. The government contends that the defendants did not object to his qualifications as an expert, and thus our review on this issue is for plain error. We are somewhat taken aback by this argument. The defendants raised an objection as to whether Freyberger was qualified, pursuant to Rules 702 and 703 of the Federal Rules of Evidence, to give specific testimony as to "what words mean in the course of these intercepts . . . ." In contrast to our discussion regarding the admission of the wiretap orders, we find the objection here sufficiently clear to preserve the issue. As we said in *United States v. Joseph*, 310 F.3d 975, 977 (7th Cir. 2002), in regard to a defendant's failure to cite the rule on which the objection was based: "It is true that defense counsel did not cite Rule 404(b) explicitly at the motion-in-limine hearing, but he did say enough to preserve that ground for appeal. It was clear to everyone at the hearing that the parties were arguing about Rule 404(b)." *See also* Fed. R. Evid. 103(a)(1) (to preserve evidentiary objection for appeal, party must make a "timely objection or motion to strike . . . stating the specific ground of objection, if the specific ground was not apparent from the context"). The objection here was clear. Accordingly, our review of whether Freyberger was properly qualified as an expert is *de novo* and our review of the decision to admit the testimony is for an abuse of discretion. *United States v. Allen*, 269 F.3d 842 (7th Cir. 2001).

Beyond that small victory, however, the defendants fail to carry the day on this issue. Freyberger was properly qualified. Under Rule 702, an expert may testify if he has specialized knowledge and is qualified based on "knowledge,

skill, experience, training, or education" and his testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." *See Allen*, 269 F.3d at 845-46. At the time of his testimony, Freyberger had been a DEA agent for 7 years and previously had worked for 5 years as a narcotics canine officer for the United States Customs Service. He had participated in undercover drug enforcement and had received special training in conducting wiretap investigations and had monitored telephone conversations during his 5 years as an agent in Chicago. He had also served as a co-case agent in two previous wiretap investigations in Evansville, Indiana. We find that this experience, as well as his specific experience with these defendants, qualified him to interpret the drug code they used.

We now arrive at the sentencing issues and our procedure, set out in *United States v. Paladino*, 401 F.3d 471 (7th Cir. 2005), for implementing the recent decision in *Booker v. United States*, 125 S. Ct. 738 (2005), which, as we all know well by now, made the United States Sentencing Guidelines advisory. In *Paladino* we recognized that in some cases it is possible for us to know—by something a judge said—that he would have given the same sentence which was imposed even if he had been prescient enough to know that the guidelines were advisory. But, we noted, in most cases we cannot know for sure what the judge would have done. The cases of McGraw, Lenover, Wolfe, McMillan, and DuRegger are in the latter category. Gray does not argue that he is entitled to be resentenced. His life sentence is a result of his two prior felony drug convictions and the provisions of 21 U.S.C. § 841(b)(1)(A), and not by operation of the sentencing guidelines.

In sentencing Wolfe, the district judge made comments which very well might lead us to believe that, in fact, Wolfe's sentence could have been less harsh had it not been for the (then) mandatory guidelines. The judge said:

> This is a harsh sentence. It is a harsh sentence for several reasons, none of which are mysterious. Congress says when you involve yourself with this much methamphetamine you get ten years to life. The Guidelines propounded by the Executive Branch of the Government are very harsh.

But then the judge continued, "[T]hey are harsh for a reason, and the reason is—that reason you know very well because you have experienced it, how it [methamphetamine] just tears up the family . . . ." Any conclusions we might draw from that statement are again tempered by the judge's further comments about addiction and duress. He notes that the guidelines "say what they say about departures and not being available for addiction." He looks to another potentially mitigating factor—that is, Wolfe's relationship with McGraw, and notes that even a "casual observer" could see clearly "who was in charge of that relationship and who caused you to make many of the decisions that you made." But he found she did not qualify for a reduction in her guideline range for coercion and duress. So, the judge concluded, "pursuant to the Sentencing Reform Act of 1984, it is my judgment that you should receive the minimum under these Guidelines," which was a whopping 324 months. From this record, it is impossible for us to know whether the sentence would have been different had the judge known that the guidelines were advisory and, in fact, that he could consider factors he was prohibited from considering under the then-mandatory guidelines.

In sentencing DuRegger, the judge stated that it was his "responsibility to look at the Guidelines again and see if the Guidelines take into account the same things I would take into account if they didn't exist." He concluded they did: "I find in this case that they do take into account exactly what I would have looked at and what I used to look at before the Guidelines came into effect." He noted particularly that they took into effect the amount of drugs involved, the guns

involved, and acceptance of responsibility. But later, he noted that the guidelines had removed some factors from his consideration: "And one of the things these Guidelines have done is they have moved from the court's discretion and consideration any guidance from what we used to call a medical model; that is, dealing with addiction as a disease." He therefore declined to depart from the guidelines and said, "[F]ollowing and reading these Guidelines I can't—I won't depart."

The sentencings of McMillin, Lenover, and McGraw do not so clearly indicate specific factors which raise the possibility that the sentences might have been different but for the guidelines. Nevertheless, in McGraw's case, the judge again referred to the "harsh sentences" set out by Congress and the Sentencing Commission. Similarly, in McMillin's case, he again referred to the harsh sentences set out by Congress and the Sentencing Commission and sentenced him on the low end of the guideline range. In Lenover's case, the judge found again that the guidelines took into account things he would have considered if the guidelines didn't exist and then sentenced Lenover to the middle of the range. Lenover's case, particularly, illustrates what we meant in *Paladino* when we rejected the notion that if the judge imposes a sentence higher than the minimum, he would not have imposed a "lighter sentence even if he had known the guidelines were merely advisory." We said that a "conscientious judge—one who took the guidelines seriously whatever his private views—would pick a sentence relative to the guideline range. If he thought the defendant a more serious offender than an offender at the bottom of the range, he would give him a higher sentence even if he thought the entire range too high." *Id.*

Because in the cases of these five defendants we cannot know for sure what the judge would have done had he known what the *Booker* decision was going to be, our remedy, as set out in *Paladino*, is to ask him. We therefore, pursuant to

the procedure explained in *Paladino*, retain jurisdiction of the appeal and "order a limited remand to permit the sentencing judge to determine whether he would (if required to resentence) reimpose his original sentence."

For the foregoing reasons, the judgments of conviction of all the defendants are AFFIRMED; as to the sentences of Wolfe, DuRegger, Lenover, McGraw, and McMillin, we direct a limited remand to the district court as indicated herein and retain appellate jurisdiction over the case.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*