# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 05-1465

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

TERRANCE THORNTON,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 CR 482—**James B. Zagel**, *Judge.*

ARGUED MAY 5, 2006—DECIDED SEPTEMBER 12, 2006

Before KANNE, WOOD, and SYKES, *Circuit Judges.*

KANNE, *Circuit Judge.* Defendant Terrance Thornton was convicted of being a felon in possession of a firearm, 18 U.S.C. § 922(g), and possession of a firearm with an obliterated serial number, § 922(k). Thornton was sentenced to 252 months' imprisonment (21 years) under the Armed Career Criminal Act, 18 U.S.C. § 924(e), ("ACCA"). He now presents us with a number of issues for review attacking his convictions and sentence under the ACCA, none of which merit any relief. The convictions and sentence are therefore affirmed.

## I. HISTORY

Late on a November night in 2002, the city of Elgin, Illinois was rocked by gunfire from a drive-by shooting. Initial reports indicated only the location of the shooting and that the shots had been fired from a Sport Utility Vehicle. Several officers responded directly to the scene of the shooting, while others scoured the area hoping to find the suspect vehicle.

Within twenty minutes, Officers Sheehan and Schultz, driving separately, came upon an SUV parked at a gas station. This gas station was within a couple of miles of the shooting. While still in his car, Schultz was able to see the driver of the SUV, later identified as Darius Hyte, get out and go into the station. The officers decided to investigate. As they pulled into the gas station, Sheehan noticed that the SUV was the only car in the lot, and that the only people in the gas station were two customers, later identified as Hyte and Thornton, and one store employee. The SUV was parked with its engine running and lights on.

The officers stopped their cars and headed toward the gas station's front door. Before they reached it, Hyte and Thornton came out. Sheehan asked Thornton to step aside and Schultz did the same with Hyte. Sheehan then asked Thornton if he was driving the SUV. Thornton responded by saying that "his girl was driving" it. After getting Thornton's name and birth date, Sheehan used the police radio on his person to run a warrant check on Thornton. It came back positive for an outstanding warrant for felony domestic battery. Thornton was arrested. The whole encounter, from the time Sheehan first approached Thornton until the time dispatch provided the results of the warrant check, lasted three to four minutes.

After placing Thornton in his squad car, Sheehan looked into the passenger window of the SUV. Sitting on the passenger side floorboard he saw a black semiautomatic

handgun and a box of ammunition. He opened the door of the SUV to take a closer look, but never touched the gun. Evidence technicians arrived later to collect the gun, which had its serial number obliterated. Two cellular phones were also retrieved from the SUV. One phone was found sitting between the passenger seat and the center console, and the other was in the center console. Further investigation of the phone found closer to the passenger seat revealed several numbers programmed into its address book belonging to people who knew Thornton. One of the numbers in the address book was an attorney who had represented Thornton. The phone also logged an incoming call on the night of the shooting from a girlfriend of Thornton's.

Officers also collected an empty Swisher Sweets cigar box and a pack of nearly empty Newport cigarettes from the SUV. When he was arrested, Thornton had a new, unopened box of Philly blunt cigars. Hyte was also arrested, and he had in his possession a pack of Newport cigarettes.

Forensic evidence later tied the gun in the SUV to the shooting. The shell casings at the scene of the shooting and those found in the SUV were the same nine millimeter Luger type. At trial, an Illinois State Police firearm's expert testified that the shell casings found at the scene of the shooting had been fired from the gun found in the SUV. Forensic evidence also tied Thornton to the gun, though indirectly—his fingerprint was found on the magazine in the handgun.

Prior to trial, the judge denied Thornton's motion to suppress, which argued the evidence against him was obtained as a result of an unconstitutional stop and arrest. At trial, Thornton objected to a portion of the jury instruction defining joint possession. His objection was to the portion of the instruction italicized below:

> Possession may be sole or joint. If one person alone has actual or constructive possession of a firearm, possession is sole. If two or more persons share actual

> constructive possession of a firearm, possession is joint. *An individual may possess a firearm even if other individuals may have access to a location where possession is alleged. Also, an individual may possess a firearm even if other individuals share the ability to exercise control over the firearm. Possession may be joint.*

Thornton argued that this portion of the instruction defined possession too broadly, an argument he now reasserts before us.

Also at trial, the judge sustained the government's objections to Thornton's attempts to call two police officers to the stand: Officers Hooker and Mendiola. Thornton wanted to call Hooker to impeach Officer Schultz's testimony that there were only two people (Thornton and Hyte) in the gas station when the officers arrived on the scene. According to Thornton, Hooker had been told by the gas station attendant that two other customers were present in the store when Thornton and Hyte entered. Thornton also proffered that Mendiola would testify that he was present, along with the other officers, when Hyte was initially encountered outside of the gas station. According to Thornton, Mendiola could establish that while being questioned, Hyte called another person with his cellular phone, and that Hyte told Mendiola the SUV belonged to Hyte's girlfriend. Thornton viewed the evidence of Hyte calling someone as raising the inference a third party—Hyte's girlfriend—might have been present in the SUV and in possession of the gun. The judge excluded both witnesses on hearsay grounds.

After he was convicted, Thornton was sentenced under the ACCA. One of the three necessary predicate violent felonies included a 1990 burglary conviction. The only evidence in the record of this conviction is an entry in

Thornton's Presentence Investigation Report ("PSR"). After identifying the conviction, the PSR states:

> According to court records, the defendant was originally charged with residential burglary, possession of cannabis and theft. He was convicted on a plea of guilty to the amended charge of burglary, and the other two counts were dismissed (nolle prosequi). The defendant was represented by counsel.

> The amended criminal complaint charged that the defendant committed the offense of burglary (a Class 2 felony) in that without authority, he knowingly entered a building of another, [name and address omitted], with the intent to commit a theft.

At his sentencing hearing, Thornton argued that all of his qualifying convictions should have been submitted to the jury. He also took specific aim at the 1990 burglary conviction, arguing that it was "incorrect" to designate this as a qualifying conviction. The entirety of his objection in this regard is as follows:

> In addition, one of the cases that [was] mentioned was the 1990 case regarding him being a career criminal in the PSI report was this 1990 case for burglary case. It is a burglary case. It is not a residential burglary case. There is case law out there that discusses this in US v. Hicks that states that a general burglary does not fall within the violent felony provision to be eligible under 924.

The government maintained that all of Thornton's qualifying convictions were properly considered. The judge found the Guideline's sentence—which included the ACCA enhancement—properly calculated and sentenced Thornton accordingly.

## II. ANALYSIS

Thornton raises the following issues with regard to his convictions, which will be addressed in turn: first, lack of both reasonable suspicion to stop and probable cause to arrest; second, insufficient evidence to support the jury's verdict; third, error in the jury instruction defining possession; and, fourth, abuse of discretion in the district judge's exclusion of certain witness testimony. He also attacks his sentence under the ACCA and the reasonableness of his sentence.

*A. Convictions*

First, the district judge made no error in denying the motion to suppress. We review the court's legal conclusions de novo and factual determinations for clear error. *United States v. Cellitti*, 387 F.3d 618, 621 (7th Cir. 2004) (citation omitted). Thornton argues the officers did not have reasonable suspicion to stop him when he first came out of the gas station, but this argument misstates the judge's ruling and ignores crucial facts upon which the judge relied. What the judge said was that when Officer Sheehan first approached Thornton coming out of the gas station and asked him whether the SUV was his, the encounter was voluntary. Thornton points us to no facts in the record giving us reason to doubt this ruling. *See, e.g.*, *Kaupp v. Texas*, 538 U.S. 626, 630 (2003) (giving examples of circumstances indicating a seizure as opposed to a voluntary encounter, such as "'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled'") (quoting *United States v. Mendehall*, 466 U.S. 544, 554 (1980)).

All the officer did was ask Thornton questions as he came out of the gas station, which Thornton answered volun-

tarily. There were three officers, but Thornton was also accompanied by Hyte. The officers neither displayed their weapons nor touched either suspect, and there is no indication whatsoever in the record that the officers' tone, language, or other action would have communicated to Thornton that he was seized. *See id.* at 629 (explaining that a stop is a seizure and not voluntary when "the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business'") (quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991)). Thus, no reasonable suspicion was necessary when Officer Sheehan first approached Thornton, and its existence at the beginning of the encounter is therefore irrelevant. *See United States v. Hendricks*, 319 F.3d 993, 999 (7th Cir. 2004) ("[L]aw enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen.") (quoting *United States v. Drayton*, 536 U.S. 194, 200 (2002)).

The judge also decided that from the outset the officers had reasonable suspicion to believe the SUV was involved in criminal activity. Furthermore, the judge concluded that reasonable suspicion to stop Thornton existed once he voluntarily tied himself to the SUV by telling the officer that his girlfriend was driving it. We agree. *See United States v. Raibley*, 243 F.3d 1069, 1074 (7th Cir. 2001) ("Even facts susceptible of an innocent construction will support the decision to detain an individual momentarily for questioning, so long as one may rationally infer from the totality of the circumstances—the whole picture, that the person may be involved in criminal activity.") (citations and quotations omitted). Therefore, Thornton was properly stopped after he voluntarily tied himself to the SUV.

And this proper investigatory stop did not turn into an arrest without probable cause. Within three to four minutes

of initially approaching Thornton, the officers learned that a warrant was outstanding for his arrest. That information supports probable cause for the arrest whether or not it was correct. *See United States v. Mounts*, 248 F.3d 712, 715 (7th Cir. 2001) (citing *United States v. Hensley*, 469 U.S. 221, 231 (1985)); *United States v. Hairston*, 763 F.2d 233, 235 (7th Cir. 1985).

Thornton also argues that the officers did not have a proper reason to look into the windows of the SUV, but this argument is clearly without merit. An officer needs no reason to look through the windows of a car parked in a public place. *Texas v. Brown*, 460 U.S. 730, 740 (1983) ("There is no legitimate expectation of privacy shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers.") (citations omitted); *United States v. Willis*, 37 F.3d 313, 315-17 (7th Cir. 1994) (explaining that police officer did not need reasonable suspicion to look into a car parked in a school parking lot).

Second, we review Thornton's sufficiency of the evidence argument by viewing all of the facts in the light most favorable to the prosecution and questioning whether any rational trier of fact could have found him guilty beyond a reasonable doubt. *United States v. Carrillo*, 435 F.3d 767, 775 (7th Cir. 2006). We will only overturn Thornton's conviction "if the record is devoid of evidence" of guilt. *Id.* (citation omitted). Thornton argues the evidence was insufficient to prove he knowingly possessed a gun, much less a gun with an obliterated serial number. The gun was found on the passenger side floorboard of the SUV. Evidence placing Thornton in the SUV included, among other things: the cellular phone near the passenger seat which contained the phone numbers of Thornton's girlfriend and attorney; Thornton's proximity to the SUV at the gas station with its engine running and the lights on; and, the empty packet of cigars in the SUV and the fresh pack

Thornton had on his person after leaving the gas station. Thornton is also tied quite closely to the gun by the presence of his fingerprint on the magazine found in it. From these facts a rational jury could have concluded that Thornton knowingly possessed the gun. After concluding that he knowingly possessed the gun, the jury also could have concluded that he knew the gun's serial number had been obliterated, given that one need only look at the gun to attain that knowledge. *See, e.g.*, *United States v. Tylkowski*, 9 F.3d 1255, 1260-61 (7th Cir. 1993) (circumstantial evidence of defendant's control over a box sufficient to support the reasonable inference that he knew it contained illegally converted machine guns with obliterated serial numbers).

Third, we reject Thornton's argument that the jury instruction did not properly define possession. Whether an instruction accurately states the law is an issue we review de novo. *United States v. Smith*, 308 F.3d 726, 740 (7th Cir. 2002). The portion of the instruction Thornton attacks as defining the law too broadly—that defining joint possession—accurately states the law because possession may be joint, and nothing about the way the instruction reads misstates that principle. *See United States v. Kitchen*, 57 F.3d 516, 521 (7th Cir. 1995) (citations omitted).

Fourth, there is no error in the judge's ruling to exclude the testimony of Officers Hooker and Mendiola, a ruling we review for abuse of discretion. *United States v. Aldaco*, 201 F.3d 979, 985 (7th Cir. 2000). That proposed testimony—a recounting by the officers of what others told them—would have been nothing more than impermissible hearsay. *See* Fed. R. Evid. 801, 802. The judge did not abuse his discretion in excluding it.

*B. Sentence*

Thornton's primary attack is that he should not have been sentenced under the ACCA, but he also argues that his sentence is unreasonable. There are three facets to his argument that he was improperly sentenced under the ACCA. We can easily reject the first: that the jury was required to pass on the existence of all qualifying convictions. *See United States v. Stevens*, 453 F.3d 963, 967 (7th Cir. 2006) (noting that "*Almendarez-Torres* remains intact"); *United States v. Browning*, 436 F.3d 780, 782 (7th Cir. 2006) (explaining that "the continued authority of *Almendarez-Torres* is not for us to decide"); *see also United States v. Williams*, 410 F.3d 397, 402 (7th Cir. 2005) ("[T]he district court does not violate a defendant's Sixth Amendment right to a jury trial by making findings as to his criminal record that exposes him to greater criminal penalties.") (citations omitted).

Thornton's second argument, which we review for plain error only, is that he cannot be sentenced as an armed career criminal when the only evidence of his convictions—particularly the 1990 burglary conviction—is the information contained in the PSR. Thornton wants us to hold that a judge must actually have before him or her the actual records of previous convictions (state-court charging documents, plea agreements, etc.) before finding a defendant eligible for sentencing under the ACCA. In other words, Thornton wants us to hold that the PSR's description of the relevant records is always insufficient to support a finding that a defendant is eligible for sentencing under the ACCA.

Thornton did not make this objection below. His only objection relied upon the information in the PSR (as opposed to challenging its sufficiency) and was that the 1990 burglary conviction had been amended from a residential burglary to a general burglary of a building

and therefore could not qualify under the ACCA.[1] Moreover, Thornton did not even raise this argument in his opening brief. That brief only argues that reference to the charging document alone does not ensure that Thornton was convicted of generic burglary (an issue we deal with below).

Normally, we do not consider arguments raised in reply. *United States v. LaShay*, 417 F.3d 715, 719 (7th Cir. 2005) ("Typically, arguments first raised in a reply brief are considered waived.") (citation omitted). In any event, we will consider this argument for plain error. Fed. R. Crim. P.

---

[1] We note that this argument appears to be based on the false notion that only a residential burglary qualifies as a "violent felony" for purposes of the ACCA. *See Taylor v. United States*, 495 U.S. 575, 593-94, 598 (1990) (rejecting the view that the ACCA incorporates all the common law limitations of burglary, such as a dwelling, in favor of a broader definition including unlawful entry into "a building or other structure") (citations omitted); *United States v. King*, 62 F.3d 891, 896 (7th Cir. 1995) (explaining that burglary of any building is sufficient to meet the definition of generic burglary).

As Thornton's counsel alluded to at the sentencing hearing, and Thornton himself later argued in a pro se motion to reduce sentence, *United States v. Hicks*, 122 F.3d 12 (7th Cir. 1997) explains that only burglary "of a dwelling," and not mere burglary of a building, is sufficient to qualify as a "crime of violence" under the career offender enhancement of U.S.S.G. § 4B1.1. But that is because the definition of "crime of violence" in § 4B1.2 is specifically limited to "burglary of a dwelling." The definition of "violent felony" for purposes of the ACCA is not so limited, and includes burglaries of buildings or structures. *See* 18 U.S.C. § 924(e)(2)(B)(ii); U.S. Sentencing Guidelines Manual § 4B1.4, Application Note 1 (2004) (explaining that "[i]t is to be noted that the definition[ ] of 'violent felony' . . . in 18 U.S.C. § 924(e)(2) [is] not identical to the definition[ ] of 'crime of violence' . . . used in § 4B1.1."); *see also Taylor*, 495 U.S. at 593-94, 598; *King*, 62 F.3d at 896.

52(b); *United States v. Gray*, 410 F.3d 338, 345 (7th Cir. 2005). To require relief, an error must be plain, affect substantial rights, and also "seriously affect the fairness, integrity or public reputation of judicial proceedings." *Gray*, 410 F.3d at 345 (citations and quotations omitted).

The district court's reliance on the PSR in this case is not plain error. We have previously explained that it is not even error for a court, when sentencing under the ACCA, to rely on an unchallenged PSR when determining whether the necessary qualifying convictions exist. *See United States v. Skidmore*, 254 F.3d 635, 641 n.4 (7th Cir. 2001) (explaining that "the PSR satisfied the government's burden under 18 U.S.C. § 924(e)(1) to establish that [the defendant] had three prior violent felony convictions" where the PSR was unchallenged); *United States v. Davenport*, 986 F.2d 1047, 1048 (7th Cir. 1993) (finding no error where the court relied on the PSR and did not consider charging documents while sentencing under ACCA); *United States v. Hudspeth*, 42 F.3d 1015, 1019 n.6 (7th Cir. 1994) (en banc) ("A certified record of conviction *or a presentence investigation report,* if not challenged, will normally satisfy" the government's burden to show three prior violent felony convictions.) (emphasis added) (citations omitted).

Even assuming reliance on the PSR was error, there is no showing here that Thornton's substantial rights have been affected, and we see no reason to presume such prejudice where its existence is easily discoverable by the defendant. *United States v. Olano*, 507 U.S. 725, 735 (1993) ("Normally, although perhaps not in every case, the defendant must make a specific showing of prejudice to satisfy the 'affecting substantial rights' prong of Rule 52(b)."). All Thornton needed to do to show prejudice was retrieve the amended criminal complaint from the 1990 burglary conviction. With that document in hand, it would be easy for him to determine whether the PSR's description of it was accurate. For all we know, Thornton's trial counsel may very well have

done this and concluded the PSR accurately recites Thornton's conviction. *Davenport*, 986 F.2d at 1050 (positing that it may be that "trial counsel obtained the charging papers, recognized that they satisfy *Taylor*, and saw no point in insisting that the record be padded with evidence adverse to his client").

Thornton's third argument with regard to sentencing under the ACCA is that even if we find no reversible error in the district court's reliance on the PSR, the information therein is still insufficient to show that the 1990 burglary conviction is a qualifying "violent felony." *See* 18 U.S.C. § 924(e). It is undisputed that in 1990 Illinois had what is called a "nongeneric" burglary statute. The distinctive characteristic of a nongeneric burglary statute is that it criminalizes unlawful entry into structures other than buildings, such as cars, railroad cars, and boats. For purposes of the ACCA, however, burglary is only a violent felony if it is of the generic kind; that is, unlawful entry into a building or other structure—boats or cars do not suffice. *Shepard v. United States*, 544 U.S. 13, 15-16 (2005) (explaining that the ACCA "makes burglary a violent felony only if committed in a building or enclosed space ('generic burglary'), not in a boat or motor vehicle.").

The problem for courts applying the ACCA is what to do with a conviction under a nongeneric burglary statute, because it may be possible that the defendant was merely convicted of burglarizing a car or boat and therefore not subject to the enhancement. The Supreme Court initially answered this question in the context of a conviction after a jury trial, explaining that a court should determine whether the relevant "charging paper and jury instructions actually required the jury to find all the elements of generic burglary in order to convict the defendant," without delving any further into the facts surrounding the conviction. *Taylor v. United States*, 495 U.S. 575, 602 (1990). In

*Shepard*, the Court made clear this holding applies to guilty
pleas:

> We hold that enquiry under the ACCA to determine
> whether a plea of guilty to burglary defined by a
> nongeneric statute necessarily admitted elements of the
> generic offense is limited to *the terms of the charging
> document*, the terms of a plea agreement or transcript
> of colloquy between judge and defendant in which the
> factual basis for the plea was confirmed by the defen-
> dant, or to some comparable judicial record of this
> information.

544 U.S. at 26 (emphasis added). The PSR in this case
makes clear that Thornton pled guilty to an amended
charge that he "committed the offense of burglary (a Class
2 felony) in that without authority, he knowingly entered a
building of another, [name and address omitted], with the
intent to commit a theft." The PSR's specific reference to the
"amended criminal complaint" dispels any doubt about
whether it relies on proper sources. *Cf. United States v.
Blake*, 415 F.3d 625, 629-30 (7th Cir. 2005) (remanding with
instructions that the sentencing judge be sure the "court
records" referred to in the PSR complied with *Shepard* for
purposes of applying the ACCA). And the issues raised by
Illinois's nongeneric burglary statute are obviated by the
charge's specific allegation of the elements of generic
burglary. *Taylor*, 495 U.S. at 598 (defining generic burglary
as "an unlawful or unprivileged entry into, or remaining in,
a building or other structure, with intent to commit a
crime") (citations omitted). Thornton's plea of guilty to this
charge is sufficient to show that the 1990 burglary convic-
tion is a violent felony for purposes of the ACCA.

Finally, we reject Thornton's argument that his sentence
is unreasonable. He was sentenced within the applicable
Guidelines' range, which gives rise to a presumption that
his sentence is reasonable. *United States v. Mykytiuk*, 415

F.3d 606, 608 (7th Cir. 2005). Thornton's nitpicking of the judge's explanation gets him nowhere, especially where he raised no substantial argument for a sentence outside of the Guidelines range. *See United States v. Spano*, 447 F.3d 517, 519 (7th Cir. 2006). Thornton's sentence is within a properly calculated Guidelines range and he has not made a showing of unreasonableness. *Id.* at 519-20.

### III.  CONCLUSION

Accordingly, Thornton's convictions and sentence are AFFIRMED.

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*