In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-1297

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

PHILLIP RUCKER,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 10 CR 182 — **Rudy Lozano**, *Judge.*

ARGUED NOVEMBER 15, 2013 — DECIDED DECEMBER 31, 2013

Before FLAUM and HAMILTON, *Circuit Judges,* and KAPALA,
District Judge.[*]

KAPALA, *District Judge.* After a jury found defendant, Phillip
Rucker, guilty of one count of wire fraud in violation of 18
U.S.C. § 1343, the district court sentenced him to 30 months'

[*] The Honorable Frederick J. Kapala of the United States District Court for
the Northern District of Illinois, sitting by designation.

imprisonment, one year of supervised release, and ordered him to pay $73,488.95 in restitution. In this direct criminal appeal, Rucker contends that the district court erred in refusing to allow him to use a prior conviction to impeach a testifying co-defendant. We affirm.

## I.  Background

The grand jury charged Rucker, Jerry Haymon, and Sheila Chandler, with engaging in a mortgage fraud scheme. Count III of the indictment, the only count in which Rucker was named, alleged the following. With the promise of a $10,000 payment, Rucker recruited Leequiter Smith to purchase residential property at 3758 Buchanan Street in Gary, Indiana for $85,000. Haymon led the owner, Margaret Peterson, to believe that he would sell the property for approximately $35,000. Rucker had Smith sign numerous false documents to support her loan application. Chandler completed a mortgage application for Smith knowing it contained false information. Haymon filed a fake mechanics lien claiming that his business, Priced Right Construction and Management, LLC ("Priced Right"), was owed $44,000 for work performed on 3758 Buchanan. In fact, Priced Right performed no work at the property. The transaction closed on July 14, 2008, and on that date Rucker, Haymon, and Chandler caused $84,118.48 to be transmitted by means of wire transmission in interstate commerce from a lender in Florida to a title company in the Northern District of Indiana. After the closing, Haymon cashed a $44,000 check issued to Priced Right and paid kickbacks to Rucker, Smith, and Chandler for their roles in the scheme.

Prior to trial, the government moved in limine to exclude evidence of Chandler's November 14, 2000 conviction for a theft concerning a program receiving federal funds, in violation of 18 U.S.C. § 666(a)(1)(A), for which she received a sentence of five years' probation. On the first day of trial in December 2011, the district court took up the government's motion in limine and questioned why introducing the stale conviction was necessary since Rucker could impeach Chandler with "the fact that she pled guilty in this case." The court preliminarily granted the motion and ordered counsel to approach the bench before attempting to use the conviction for impeachment.

During the government's case, Sheila Chandler testified that she had pled guilty to two of the counts of wire fraud charged in the instant indictment, as well as nine counts of wire fraud charged in a previous federal case. Chandler stated that she began working as a loan originator in 1999 or 2000 and worked at various places. In 2004, while she was with Challenge Mortgage, she began to lie to lenders on behalf of buyers and create false documents such as W-2 forms and earnings statements to support loan applications. Chandler met Rucker in 2005 when he was also working at Challenge Mortgage as a loan officer.

Chandler further testified that in 2008, after she left Challenge Mortgage and while she was working for her son's mortgage brokerage company, Rucker called her and said that Haymon wanted to find buyers for a couple of houses that he had because there was a lot of money to be made and that she could make $10,000 per house. In connection with the sale of the house at 3758 Buchanan Street, Rucker provided Chandler

with Leequiter Smith's name, address, social security number, and date of birth. After pulling Smith's credit, Chandler believed that she could obtain a loan for her. Chandler forged the seller's signature on a $85,000 purchase agreement and gave it to Rucker to take to Smith for her signature. Chandler indicated on the uniform residential loan application that Smith was going to live in the residence so that she could obtain a FHA loan with a lower down payment and interest rate even though Chandler knew that Smith was planning to rent the residence to another. Chandler explained that Smith did not have money for a down payment. To address this problem, Haymon agreed that he would provide money for the down payment and Rucker disclosed an acquaintance, also named Smith, who he thought would assist them. Chandler created a gift letter, purportedly from Rucker's acquaintance, that provided, "I, Lamar Smith, donor, do hereby certify the following: I have made a gift of $4,000 to Leequiter Smith, whose relationship is sister." Chandler knew that Lamar Smith was not Leequiter Smith's sibling. Chandler gave the gift letter to Rucker who had both parties sign it and then he returned it to Chandler. Chandler also obtained a copy of the cashier's check that was used for the down payment, which appeared to be funded by Lamar Smith instead of Haymon, and copies of the bank statements of Lamar Smith and Leequiter Smith showing that the gift money was transferred from Lamar Smith's bank account to Leequiter Smith's bank account. All this documentation was provided to the lender. After the closing, Rucker gave Chandler two $5,000 money orders for her participation.

Prior to cross-examining Chandler, defense counsel addressed the court:

> [DEFENSE COUNSEL]: First, I'd like to ask permission from the Court to be able to use Ms. Chandler's —Ms. Chandler's 2000 conviction for theft of public funds.
>
> … .
>
> THE COURT: Counsel, she just admitted pleading guilty to 11 counts.
>
> [DEFENSE COUNSEL]: And she also—she also admitted, Your Honor, that she's been lying since 2004. I mean, that's—that's only not—she got a sentence of 5 years of probation, convicted in 2000. By 2004, she's right back doing the same sort of thing.
>
> THE COURT: Response?
>
> [DEFENSE COUNSEL]: As far—if I may—I'm sorry. If I may, as far as prejudice to the witness, I don't see how it prejudices her at all. She's already convicted.
>
> [ASSISTANT UNITED STATES ATTORNEY]: Conviction adds absolutely nothing. She's admitted over a long period of time that she's a dishonest person. He can certainly use that to impeach her. She's got 11 convictions. Another conviction that is stale doesn't add anything.

The district court denied the request.

On cross-examination, Chandler agreed that she was "in fact, a liar," that she had falsified loan documents for Haymon many times, and that they were all stealing money. Chandler said that she gave Rucker a loan package for 3758 Buchanan to take to Smith. Chandler denied speaking to Smith on the telephone about the documents in the loan package. Chandler also agreed that her plea agreement contemplated that the government would move for a downward departure pursuant to U.S.S.G. § 5K1.1 in exchange for her truthful testimony.

After Chandler finished testifying, the district court further explained its ruling regarding her 2000 conviction:

> I did not allow you to go into the conviction that was over ten years old because of the age on that, and I was not satisfied that you gave me sufficient reasons. I did not find that the probative value outweighed the prejudicial value on that. I just wanted to make a ruling on that.

Leequiter Smith testified that she met Rucker about six years earlier and they had a four-year on and off romantic relationship. In 2008, Smith was working at Family Dollar in Chicago, Illinois and mentioned to Rucker that she needed additional income. Rucker told her that she could purchase 3758 Buchanan and rent it in order to generate additional income. Rucker also told her that if she bought the house she would get $10,000. Rucker asked Smith for her W-2 forms, check stubs, and bank statement. Rucker also brought Smith papers to sign. Before she bought 3758 Buchanan, Rucker showed her the outside of the home, but she never went inside. Smith was not aware of the price of the home until the day of

closing. Because Smith did not have a down payment, Rucker gave her a $4,000 cashier's check from a Lamar Smith, which she deposited into her bank account. Smith later gave Rucker a copy of her bank statement showing the $4,000 deposit. When asked if Rucker provided her with any documentation at the time he brought the $4,000 check, Smith said "he gave me a paper," which she identified as the gift letter from Lamar Smith. Smith said that she signed the gift letter even though she does not have a brother and did not know anyone named Lamar Smith. According to Smith, Rucker was aware that she was an only child. Smith added that Rucker brought her to the closing in Indiana on July 14, 2008. After the closing, Rucker brought Smith two $5,000 money orders. According to Smith, Rucker was supposed to find a renter for her but he never did. Smith made three payments on the mortgage and then stopped because of her financial difficulties.

On cross-examination, Smith persisted in her testimony that she has never been inside 3758 Buchanan. Smith testified that she did not remember ever meeting Haymon. Smith also testified that she had just one telephone conversation with Chandler to obtain her fax number in order to fax Chandler a bank statement.

A representative of the lender, Taylor, Bean & Whitaker, testified that the funds for the purchase of 3758 Buchanan were transferred from Ocala, Florida, to Indiana Title Company on July 14, 2008. The lender's representative also testified that had the lender known about the falsified documents submitted in support of the loan application, it would have rejected the loan.

According to the Lake County Indiana Assessor's office, the fair market value of 3758 Buchanan in July 2008 was $43,000. On July 14, 2008, Haymon cashed a $44,000 check at a currency exchange in Chicago and purchased eight $5,000 money orders. As of early 2010, the claimed improvements to 3758 Buchanan, identified in the invoice supporting the $44,000 mechanics lien filed by Priced Right and released on July 14, 2008, had not been made.

Rucker testified on his own behalf and denied participating in any fraudulent activity in connection with the sale of 3758 Buchanan. According to Rucker, he had an intimate relationship with Smith but the intimate aspect of their relationship ended when he reconciled with his wife. Haymon showed the property at 3758 Buchanan to Rucker but he found it too small for his family. Thereafter, Rucker referred Smith to Haymon. Rucker had an agreement with Haymon that he would receive $10,000 for referring a buyer. In May 2008, Smith met with Rucker and Haymon at Haymon's office before Rucker took her to 3758 Buchanan where she walked through the property and met the seller, Margaret Peterson. When they returned to Haymon's office, Haymon asked Smith if she liked the property and she said yes. Haymon told Smith about his down payment assistance program and he explained to her that he would pay her insurance for the first year and at the end of the closing she would receive $10,000. Smith left the meeting after Haymon said that he had to get the house appraised and send a purchase agreement to the seller.

Rucker testified further that since he had to drive to Smith's house in Chicago to pick up a cookie order from her aunt, he also picked up Smith's W-2, her last two pay stubs, and her

bank statements, and brought them back to Indiana. Rucker gave these documents to Chandler's son to take to his mother. According to Rucker, there came a point in time when Haymon called him and told him that the title company wanted to see the down payment come from Smith's bank account. As a result, an associate of Haymon's named Lamar Smith got a cashier's check from the bank and put it into an envelope which he gave to Haymon. Haymon gave the check to Rucker, and he brought it to Smith and told her to put it into her bank account. On a different occasion, Rucker went to Smith's workplace to bring her a manila envelope of documents that Haymon and Chandler said she needed to re-sign. Rucker did not look at the documents in the envelope. According to Rucker, Smith was speaking to Chandler on the phone as she was signing the documents while Rucker was shopping inside the Family Dollar Store. Rucker brought the envelope back to Haymon who later gave it to Chandler. Rucker said he did not know what documents were in the envelope. Rucker attended the closing but had to leave the room shortly after it began and did not return until the closing was over. After the closing, Rucker received his $10,000 referral fee and later brought Smith her $10,000. Rucker testified that he did not think there was any impropriety or fraud taking place and, at the time, knew nothing of the mechanics lien that Haymon put on the property. Rucker found a renter for the property but it did not work out because the renter could not get the utilities turned on.

At the conclusion of the trial, the jury deliberated and returned a guilty verdict against Rucker. Thereafter, the court

sentenced Rucker to 30 months' imprisonment. Rucker timely appealed.

## II. Discussion

Rucker's sole argument on appeal is that the district court erroneously precluded the defense from introducing evidence of Chandler's 2000 conviction for a theft concerning a program receiving federal funds, because Chandler's credibility was central to the government's case and the probative value of the prior conviction substantially outweighed its prejudicial effect. In response, the government argues that the district court did not abuse its discretion in finding that the probative value of Chandler's remote conviction did not substantially outweigh the prejudicial effect of presenting cumulative evidence. Alternatively, the government argues that any error was harmless.

This Court reviews evidentiary rulings of the district court for abuse of discretion. *United States v. Henderson*, 736 F.3d 1128, 1130 (7th Cir. 2013). Federal Rule of Evidence 609(b) applies to remote convictions, that is, convictions for which "more than 10 years have passed since the witness's conviction or release from confinement for it, whichever is later." Fed. R. Evid. 609(b). Such a conviction is admissible only if the court makes a finding that "(1) its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect; and (2) the proponent gives an adverse party reasonable written notice of the intent to use it so that the party has a fair opportunity to contest its use." *Id*. Remote convictions are to "be admitted very rarely and only in exceptional

circumstances." *United States v. Redditt*, 381 F.3d 597, 601 (7th Cir. 2004) (quotation marks omitted).

In this case, there is no issue as to Rucker giving notice of his intent to use the remote conviction to impeach Chandler because the government's pretrial motion in limine to preclude use of that conviction clearly shows that the government had notice. Also, it is undisputed that when Chandler testified in December 2011, more than ten years had passed since her 2000 conviction for which she was not confined but rather served a term of probation. *See United States v. Rogers*, 542 F.3d 197, 201 (7th Cir. 2008) (noting that "confinement for purposes of the ten-year time limit in Rule 609(b) does not include periods of probation" (quotation marks omitted)). Thus, the only issue is whether the district court abused its discretion in finding that, under the circumstances, the probative value of the prior conviction did not substantially outweigh its prejudicial effect.

As to the specific facts and circumstances that would support the required finding by the trial court, Rucker maintains that Chandler's 2000 conviction for a theft concerning a program receiving federal funds was especially probative because it shows that her trial testimony, that she began lying in 2004, was false. Rucker, however, mischaracterizes Chandler's testimony. Chandler testified that she began to lie to mortgage lenders on behalf of buyers and to create false documents in 2004, not that she was never dishonest before 2004. As such, Chandler's 2000 conviction does not have the probative value that Rucker assigns to it.

Rucker also maintains that Chandler's testimony "was arguably the lynchpin of the government's case against him"

such that her credibility was a crucial factor the jury had to consider in determining whether the government had proven its case against him beyond a reasonable doubt. According to Rucker, Chandler's testimony that the fake gift letter was his idea was the strongest and only evidence presented by the government that he knowingly and with intent to defraud participated in the alleged scheme to commit wire fraud. Rucker overstates the significance of Chandler's testimony. While it was an important part of the government's case, Chandler's testimony was not the only evidence showing that Rucker knowingly participated in the fraud scheme.

Smith's testimony substantiates Rucker's knowing participation in the scheme and thereby corroborates Chandler's account of Rucker's activities. Smith testified that Rucker told her about the property, promised her $10,000 at closing, and brought her all the necessary documents for the house purchase including the fake gift letter and the misleading $4,000 cashier's check. Smith also testified that Rucker collected all her financial information, including Smith's bank statement showing the $4,000 "gift" that was deposited into her account, and took her to the closing to purchase a house that she had never been inside.

Additionally, apart from Chandler's testimony, there was circumstantial evidence presented at trial, corroborated with documentary evidence, that established Rucker's knowing participation in the scheme to defraud the bank in connection with the sale of 3758 Buchanan. *See United States v. Roberts*, 534 F.3d 560, 571 (7th Cir. 2008) ("[W]e have held that the Government may prove a specific intent to defraud through circumstantial evidence and inferences drawn from the scheme itself

that show that the scheme was reasonably calculated to deceive individuals of ordinary prudence and comprehension." (quotation marks omitted)). Most notably, based on his own trial testimony, it is clear that Rucker knew that after the closing he was going to receive a $10,000 referral fee, and that Smith was going to receive another $10,000 for doing nothing at all, in a transaction for which Smith provided no funding and for which Haymon provided the $4,000 down payment. Even giving Rucker the benefit of the doubt and assuming that the jury believed that Rucker truly thought the house was worth $85,000, the disbursement of $20,000 (nearly a quarter of the proceeds of the sale) to himself and Smith after the closing and the $4,000 contribution by Haymon was strong evidence that Rucker knew that fraud was afoot. Therefore, the jury did not need to rely on Chandler's testimony alone to conclude that Rucker knowingly engaged in this scheme to defraud.

It is also critical to note that Rucker's contention that the district court abused its discretion is difficult to reconcile with this Court's decisions in *United States v. Heath*, 447 F.3d 535 (7th Cir. 2006) and *United States v. Gray*, 410 F.3d 338 (7th Cir. 2005). In *Heath*, the defendant was charged with a scheme to defraud along with a co-defendant who had a plea agreement with the government requiring him to testify against the defendant at trial. 447 F.3d at 536–38. The district court allowed the defendant to impeach the co-defendant with his nine prior convictions all from the previous ten years, but refused to allow reference to several other convictions that occurred outside the ten-year window of Rule 609(b). *Id.* at 538. In rejecting the defendant's appellate contention that the district court erred in excluding reference to the co-defendant's remote convictions,

this Court held that "[i]t is hard to see what probative value a few additional theft convictions would have when the jury was already presented with extensive evidence that [the co-defendant] was a thief and a cheat." *Id.* at 539. This Court concluded that the district court did not abuse its discretion in ruling that the probative value of those remote convictions did not substantially outweigh the prejudicial effect of presenting cumulative evidence. *Id.*

Similarly, in *Gray*, the defendants argued that they should have been allowed to impeach their co-defendant, who testified against them at trial, with his twelve-year-old perjury conviction. 410 F.3d at 346. This Court found no abuse of discretion in excluding the remote perjury conviction where four serious felony convictions within ten-year window were admitted for impeachment. *Id.* It is worth noting that unlike the instant case, the felonies allowed for impeachment in *Gray* did not involve a dishonest act. *Id.*

In this case, in light of the admission of Chandler's eleven prior convictions for wire fraud that were within the ten-year window, her 2000 conviction had very little probative value, if any. *See Heath*, 447 F.3d at 539; *Gray*, 410 F.3d at 446. Thus, the district court did not abuse its discretion in finding that the probative value of the remote conviction did not substantially outweigh the prejudicial effect of presenting cumulative evidence. Because we agree that there was no abuse of discretion in excluding the prior conviction, we need not reach the government's alternative argument.

### III.  Conclusion

Based on the foregoing, Rucker's conviction is AFFIRMED.