Filed 8/20/21  P. v. Solins CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>CHRISTOPHER JOHN SOLINS,<br><br>　　Defendant and Appellant. | H041399<br>(Santa Clara County<br>Super. Ct. No. 212318) |
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>GEORGE JASON REGALADO,<br><br>　　Defendant and Appellant. | H042671<br>(Santa Clara County<br>Super. Ct. No. 212318) |
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>WALLY RENTERIA,<br><br>　　Defendant and Appellant. | H043702, H045926<br>(Santa Clara County<br>Super. Ct. No. 212318) |

Defendants Wally Renteria, Christopher John Solins, and George Jason Regalado were charged with over 20 other defendants in an 86-count indictment, which was the result of a wide-ranging investigation into the Brown Pride Kings (BPK), a criminal street gang in Gilroy. During 2011, and for at least five years prior, BPK was a Norteño criminal street gang with approximately 65 members that "permeate[d] throughout the entire city" of Gilroy.[1] "[T]he primary activities of the gang involved the unlawful possession of weapons, the sale of controlled substances, assault with a deadly weapon, robbery, shooting at an inhabited dwelling, felony vandalism, and assaults."

Solins pleaded no contest to four counts, admitted that he served a prior prison term, and was sentenced to four years in prison. Regalado pleaded no contest to nine counts, admitted various gang enhancements, and was sentenced to 12 years 4 months in prison.

Renteria pleaded no contest to two counts and proceeded to trial on the remaining charges. Ten counts charged against Renteria were dismissed before or during trial. A jury convicted Renteria of 16 counts: two counts of being an accessory after the fact (counts 18, 49; Penal Code, § 32),[2] one count of selling methamphetamine (count 21; Health & Saf. Code, § 11379, subd. (a)), eight counts of selling or offering to sell marijuana (counts 23, 39, 59, 60, 64, 67, 73, & 78; Health & Saf. Code, § 11360, subd. (a)), two counts of using a minor as an agent in a drug transaction (counts 26 & 30; Health & Saf. Code, § 11380), one count of using a minor to sell a controlled substance (count 29; Health & Saf. Code, § 11353), one count of conspiracy to commit assault with a firearm (count 43; §§ 182, subd. (a)(1), 245, subd. (a)(2)), and one count of offering to sell cocaine (count 58; Health & Saf. Code, § 11352, subd. (a)). Renteria was acquitted

---

[1] It was stipulated during Renteria's trial that "during calendar year 2011 and for at least five years prior to 2011, the [BPK] of Gilroy California, was a Criminal Street Gang within the meaning of Penal Code section 186.22(e) and (f) and [CALCRIM] [No.] 1401."

[2] All further statutory references are to the Penal Code unless otherwise indicated.

of one count of being an accessory after the fact (count 20; § 32), offering to sell methamphetamine (count 57; Health & Saf. Code, § 11379, subd. (a)), and employment of a minor to sell marijuana (count 72; Health & Saf. Code, § 11361, subd. (a)). The jury found true a gang enhancement allegation (§ 186.22, subd. (b)(1)(A)) on each count. The trial court found true that Renteria had a prior conviction that qualified as a serious felony (§ 667, subd. (a)) and a strike (§§ 667, subds. (b)-(i), 1170.12), two prior felony convictions for which he served separate prior prison terms (§ 667.5, subd. (b)), and a prior drug-related felony conviction (Health & Saf. Code, §§ 11370, subds. (a) & (c), 11370.2). The trial court initially sentenced Renteria to 49 years 4 months in prison, but later resentenced him to 34 years in prison.

On appeal, Renteria, Regalado, and Solins argue that a wiretap application was deficient because it failed to demonstrate necessity. Thus, they contend that the trial court should have granted their motion to quash the wiretap warrant and suppress the evidence derived from the wiretap.

Renteria separately raises these additional arguments: (1) there was insufficient evidence to convict him of using a minor as an agent in drug transactions; (2) the trial court prejudicially erred by giving an incorrect instruction on the definition of agency; (3) the trial court prejudicially erred in denying his request for a clarifying instruction on the gang enhancements; (4) the trial court prejudicially erred by not giving a simple battery instruction as a lesser included offense of accessory to felony assault; (5) cumulative errors warrant reversal of the judgment; (6) the trial court should have stayed the terms imposed for counts 21, 23, and 30 under section 654; (7) the trial court should have stayed or run concurrently the sentence for count 49; (8) the trial court abused its discretion in denying his motion to dismiss the prior strike finding; (9) his prior prison term enhancements should be stricken under amended section 667.5; and (10) his case should be remanded to allow the trial court to exercise its discretion to strike the section 667, subdivision (a) enhancement.

3

We determine that the prior prison term enhancements are no longer authorized, and we reverse and remand for the trial court to strike those enhancements and to decide whether to exercise its discretion to strike the prior serious felony enhancement.

## I.     WIRETAP APPEALS

We first address issues concerning the wiretap, which all defendants challenge on appeal.  Defendants argue that the trial court erred in denying their motion to quash the wiretap warrant.  They argue that the affidavit supporting the warrant failed to demonstrate the wiretap was necessary, and that the evidence derived from the wiretap should have been suppressed.

### A.     *Background*

In August 2011, the superior court signed an order authorizing Gilroy police to wiretap target phones associated with Renteria, Regalado, and Alexis Gonzalez.  Gilroy Police Officer Geoff Guerin filed a lengthy declaration in support of the wiretap application.  In the declaration, Guerin asserted that probable cause existed to believe that "the wire and cellular telephone communications to be intercepted will tend to establish the guilt and involvement" of the identified individuals in participation in a criminal street gang as well as associated activity such as facilitation, accessory crimes, narcotics trafficking, robbery, assault with a deadly weapon, and attempted murder.

Guerin believed that the three targets were using their phones to facilitate the ongoing criminal gang activity of BPK.  Guerin described what police knew about BPK by detailing criminal activity from 1999 to 2011 involving BPK members.  The activity included attempted murder, illegal possession and brandishing of weapons, assault and battery, threats, vandalism, and graffiti.  In 2006 Renteria was arrested for possession of a concealed handgun in a vehicle.  In March 2010, Renteria admitted being a member of BPK.  In September 2010, eight BPK members were arrested at a residence.  Also present were seven other BPK members, including Renteria.  Four cell phones seized at the residence had Renteria's phone number in the contacts list.  In October 2010, Gilroy

4

police discovered a cell phone owned by Gonzalez in his vehicle, along with firearms. The phone contained text messages with Renteria's phone discussing the sale and distribution of narcotics and firearms. In January 2011, five BPK members were arrested for a home invasion robbery. Three of the arrestees' cell phones had contact information for Renteria.

In December 2010 and January 2011, Guerin spoke with two confidential informants about the "makeup and organization of [BPK]." These confidential informants "were the initial break in the determination of the hierarchy of command within [BPK]." Guerin came to believe that Renteria was the principal organizer of BPK, and Regalado and Gonzalez were the "second and third in command of [BPK]."

Guerin's opinion was based, in part, on analysis of numerous text messages and phone records of known BPK-members communicating with the target phones. Between April and July 2011, Guerin obtained search warrants for cell call data for phone numbers associated with Renteria, Regalado, and Gonzalez. This data showed that the three called each other hundreds of times over a period of several months and exchanged numerous text messages. The text messages showed Renteria directing Regalado and Gonzalez, which demonstrated to Guerin that Renteria had a leadership position within BPK. Text messages from Regalado's and Gonzalez's phones showed offers to sell marijuana and cocaine.

In March 2011, Gilroy police set up a Facebook profile using a fictitious name, and attempted to befriend documented members of BPK. The Facebook profile resulted in some "200 confirmed Facebook friends," and numerous posts reflective of gang membership. However, it did not result in any direct evidence implicating the wiretap targets.

Guerin's opinion was also based on information gleaned from the two confidential informants previously mentioned, plus an additional third confidential informant. In a sealed attachment to the wiretap declaration, Guerin provided details about the

confidential informants. Each confidential informant had previously provided reliable information and based on their respective backgrounds were in a position to know about BPK's leadership structure. The confidential informants identified Renteria as the " 'leader' " and " 'shot caller' " for BPK, and Regalado and Gonzalez were identified as " 'second in charge' " and " 'third in charge' " of BPK.

In a section of the wiretap application concerning "Exhaustion and Necessity," Guerin described other investigative techniques that "are sometimes employed in the investigation of this type of criminal offense," including: infiltration by undercover police officers, visual surveillance, use of PEN registers, use of a grand jury in its investigative capacity, examination of physical evidence, press releases and flyer distribution, search warrants, mail covers, and interviews of witnesses and associates. Guerin concluded that these efforts were unlikely to succeed.

Guerin explained that an effort by an undercover police officer to infiltrate BPK would be too dangerous to the officer and was unlikely to succeed given the close-knit nature of the gang. Guerin determined that further use of confidential informants would be dangerous to the informants and unlikely to succeed. Guerin explained that the informants had "a very limited role" and were "unable to place themselves in a position to know the inner workings of the [t]arget [s]ubjects and the extensive involvement of the [t]arget [s]ubjects."

Guerin described the six warrants that he had already obtained for cell phone data of the wiretap targets. He explained that while useful to "document the telephone usage and patterns" of the three targets, the investigative method had failed "to prove the identity or involvement of the upper echelon of [BPK]." Guerin discussed the use of telephone PEN registers and trap and trace devices, and noted that they do not identify the persons communicating or allow monitoring of the content of phone calls, both of which are essential to the success of the investigation. Guerin explained that a grand jury investigation "might alarm the principals once potential suspects are called before a

6

Grand Jury," and there was "no reason to believe that any of the principals currently under investigation would cooperate" with such an endeavor. Guerin discussed trash searches, but concluded the likelihood of finding "any items of evidentiary value regarding the criminal activity of BPK [was] highly unlikely," and would pose a risk of being seen. Finally, Guerin discussed the use of consensual recordings, noting that "due to the close knit structure of the conspiracy, the gang and its members, infiltration by an undercover police officer and/or confidential [informant]" to undertake a consensual recording was "fraught with failure and danger." He concluded that "[t]hese techniques have been tried and were unsuccessful, or appear unlikely to succeed if tried, and/or are too dangerous" to attempt.

Prior to trial, defendants moved to compel discovery of the sealed attachment supporting the wiretap. The sealed attachment contained information about the confidential informants who had provided information about BPK. Renteria argued that the attachment was necessary to "support the argument that there was no necessity for a wire interception order within the meaning of . . . section 629.52."

An in camera hearing was held on the motion to compel discovery. The court denied the motion to compel discovery. It was "crystal clear" to the court "that the revelation of [the confidential informants'] names or any activity that they would have been involved in would have caused a breach of their security and would have exposed them to retaliation, intimidation, or even death." The court dismissed redaction as infeasible because with redactions the evidence "would have very little, if any, value at all" to the defense. The court also observed that certain details, if left unredacted, would tend to assist in identification of the confidential informants.

Defendants also moved to quash the wiretap warrant and suppress the evidence derived from the wiretap. Defendants argued that Guerin's declaration showed only what "appear[ed] to be low-level drug dealing," and that the police "already had enough

7

information to arrest" the target defendants for "selling marijuana and other drugs," which made the wiretap unnecessary.

The trial court denied the motion. It observed that the gang activity alleged "wasn't just dealing small amounts of marijuana or other controlled substances," but rather "acts of violence" and "burglaries" as well as "other items that were perceived to have been a goal of this organization and this enterprise." The court discussed the alternative investigative methods and explained why none of them would have been effective in leading to the charges sought by law enforcement. The court concluded: "I believe in this particular case as I did when I signed off, there was a necessity . . . , there was clear probable cause shown, and for those reasons I'm going to deny this particular motion to suppress."

### B. Necessity

Defendants contend that the wiretap application failed to establish the requisite necessity, and that the police "had more than enough [evidence] to accomplish their goal of arresting and prosecuting the leaders of [BPK] for drug trafficking" without the wiretap.

"In general, California law prohibits wiretapping." (*People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1195 (*Zepeda*); § 631.) A court may authorize a wiretap, however, if the application contains facts showing that "there is probable cause to believe that an individual has committed, is committing, or is about to commit one or more of the listed crimes (§ 629.52, subd. (a)); there is probable cause to believe that communications concerning the illegal activities will be obtained through that interception (§ 629.52, subd. (b)); there is probable cause to believe that the communications device will be used by the person whose communications are to be intercepted (§ 629.52, subd. (c)); and '[n]ormal investigative procedures have been tried and have failed or reasonably appear either to be unlikely to succeed if tried or to be too dangerous' (§ 629.52, subd. (d) . . . )." (*People v. Leon* (2007) 40 Cal.4th 376, 384 (*Leon*).) The fourth requirement is

8

commonly referred to as the necessity requirement. (*People v. Roberts* (2010) 184 Cal.App.4th 1149, 1172.) The federal wiretapping statute employs virtually identical necessity language. (18 U.S.C. § 2518(3)(c); *Leon*, *supra*, at pp. 384-385.)

"The requirement of necessity is designed to ensure that wiretapping is neither 'routinely employed as the initial step in criminal investigation' [citation] nor 'resorted to in situations where traditional investigative techniques would suffice to expose the crime.' [Citation.] [It] can be satisfied 'by a showing in the application that ordinary investigative procedures, employed in good faith, would likely be ineffective in the particular case.' [Citation.]" (*Leon*, *supra*, 40 Cal.4th at p. 385.) "The burden of establishing necessity is 'not great.' " (*United States v. Gray* (7th Cir. 2005) 410 F.3d 338, 343.) "As numerous courts have explained . . . , it is not necessary that law enforcement officials exhaust every conceivable alternative before seeking a wiretap. [Citations.] Instead, the adequacy of the showing of necessity ' "is 'to be tested in a practical and commonsense fashion,'. . . that does not 'hamper unduly the investigative powers of law enforcement agents.' " ' [Citation.] A determination of necessity involves ' "a consideration of all the facts and circumstances." ' [Citation.]" (*Leon*, *supra*, at p. 385.) "The finding of necessity by the judge approving the wiretap is entitled to substantial deference." (*Ibid*.) Thus, "[t]he trial court's determination that the 'necessity' requirement was met is reviewed for abuse of discretion." (*Zepeda*, *supra*, 87 Cal.App.4th at p. 1204.)

We conclude that Guerin's declaration established the requisite necessity. His detailed recitation of the lengthy investigation was more than sufficient, in our view, to show that "normal investigative procedures ha[d] been tried and . . . failed . . . ." (§ 629.52, subd. (d).) The declaration explained that Gilroy police had used numerous conventional investigative techniques to gather evidence about BPK's criminal activities. Police had seized physical evidence in the form of cell phones, which was highly suggestive of BPK's leadership structure. Police obtained search warrants for cell phone

9

call data records, which showed hundreds of communications among the suspected leadership. Confidential informants later provided valuable leads, which clarified the leadership structure but were nonetheless inadequate for obtaining direct evidence of the leadership's involvement in the planning, direction, or commission of violent crimes. The declaration plausibly explained the limitations of available investigative tools.

This showing alone was sufficient to establish the requisite necessity. (*Zepeda*, *supra*, 87 Cal.App.4th at p. 1204.) As this court has explained, "[b]ecause section 629.52, subdivision (d), like [the analogous federal provision], is 'worded in the disjunctive, the government may establish the need for a wiretap by showing *either* (i) that normal investigative procedures have been tried and failed, *or* (ii) that normal investigative procedures, though not yet tried, "reasonably appear" to be either "unlikely to succeed if tried" or "too dangerous." [Citation.] In reality, this gives the government three alternative ways to establish the need for a wiretap.' " (*Ibid*., quoting *United States v. Smith* (4th Cir. 1994) 31 F.3d 1294, 1298, fn. 2.)

Here, in addition to describing conventional methods that had been tried with little success, Guerin also described procedures that had not been utilized because they reasonably appeared to be "unlikely to succeed if tried" or "too dangerous." (§ 629.52, subd. (d).) He explained that the use of undercover officers to infiltrate such a tight-knit organization would put the officers' safety in peril. He also explained why further use of the confidential informants would be unlikely to reveal further direct evidence of the targets' involvement in the target crimes. He addressed, point by point, why other investigative techniques were unlikely to yield significant evidence. In sum, Guerin's declaration was more than sufficient to establish necessity. (*Zepeda*, *supra*, 87 Cal.App.4th at p. 1204.)

Defendants argue, however, that police "had more than enough evidence" to arrest and prosecute the leaders of BPK for drug trafficking in the absence of a wiretap. This argument lacks merit. As an initial matter, the standard is not whether the investigation

10

has produced sufficient evidence to charge a defendant. "[A] wiretap can be necessary if it gives the government the ability to 'develop an effective case.'" (*United States v. McGuire* (9th Cir.2002) 307 F.3d 1192, 1198.) An effective case, the *McGuire* court explained, means "evidence of guilt beyond a reasonable doubt, not merely evidence sufficient to secure an indictment." (*Ibid.*) Moreover, according to Guerin's declaration, investigators sought not merely to arrest and prosecute the leaders of BPK for drug trafficking, but to connect them to and arrest them for BPK's primary criminal activities, which included weapons trafficking, robbery, assault with a deadly weapon, and attempted murder. That police could have arrested the BPK leadership for relatively minor drug trafficking offenses did not preclude use of a wiretap to further investigate more serious crimes. (*Hoffa v. United States* (1966) 385 U.S. 293, 310 ["Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall short of the amount necessary to support a criminal conviction."].)

We conclude that Guerin's declaration more than satisfied the "necessity" requirement of the wiretap statutes.[3] On the facts presented, the issuing judge could reasonably have concluded that "[n]ormal investigative procedures ha[d] been tried and ha[d] failed or reasonably appear[ed] either to be unlikely to succeed if tried or to be too dangerous." (§ 629.52, subd. (d); 18 U.S.C. § 2518(3)(c).) Where, as here, defendants do not challenge the issuance of the wiretap order on any other ground, it follows that the wiretaps were authorized in compliance with the governing statutes.

---

[3] Defendants request that this court review the sealed portion of Guerin's declaration in determining whether the trial court properly denied their motion to quash and suppress evidence. In reviewing defendants' challenge to the necessity showing, we reviewed the sealed attachment to Guerin's declaration.

## C.    *Denial of Motion to Unseal*

Renteria separately asks this court to review the trial court's ruling on the motion to unseal "to determine whether the trial court erred at any stage in the process—in conducting the *in camera* hearing, in denying disclosure, or in finding that there was probable cause to grant the wire tap [*sic*] application."   In the trial court, Renteria did not challenge the wiretap warrant for lack of probable cause.  Thus, we do not address that argument on appeal.  (*People v. Davis* (2008) 168 Cal.App.4th 617, 625-627 [failure to challenge wiretap evidence on grounds other than lack of necessity forfeited those claims on appeal].)  However, Renteria did request that the sealed attachment to the wiretap application be unsealed to the extent feasible.  Thus, we address that claim on appeal.

A court may order all or any portion of a search warrant affidavit sealed if necessary to protect the identity of a confidential informant.  (Evid. Code, § 1041; *People v. Hobbs* (1994) 7 Cal.4th 948, 971 (*Hobbs*).)  When that happens, and the defendant moves to traverse or quash the warrant, the trial court must conduct an in camera hearing following a two-step procedure established in *Hobbs*:  The court must first determine "whether sufficient grounds exist for maintaining the confidentiality of the informant's identity." (*Hobbs*, *supra*, at p. 972.)  "It should then be determined whether the entirety of the affidavit or any major portion thereof is properly sealed, i.e., whether the extent of the sealing is necessary to avoid revealing the informant's identity."  (*Ibid.*)  "The prosecutor may be present at the in camera hearing; defendant and his counsel are to be excluded unless the prosecutor elects to waive any objection to their presence.  [Citation.] Defense counsel should be afforded the opportunity to submit written questions, reasonable in length, which shall be asked by the trial judge of any witness called to testify at the proceeding."  (*Id.* at p. 973.)  The court must also "take it upon itself both to examine the affidavit for possible inconsistencies or insufficiencies regarding the showing of probable cause, and inform the prosecution of the materials or witnesses it

requires." (*Ibid.*)  We review the trial court ruling on a motion to unseal a search warrant affidavit for abuse of discretion.[4]  (*Id.* at p. 976.)

We have reviewed the transcript of the in camera proceedings and the sealed and unsealed portions of the wiretap warrant application.  The sealed portion of the wiretap application contained names of the confidential informants who provided police with information about the BPK's hierarchy.  As recounted in the sealed attachment, the informants would be in danger if the extent of their cooperation with law enforcement had been revealed.  We conclude that the trial court did not abuse its discretion in denying the motion to unseal.

## II.    RENTERIA'S APPEAL
### A.    *Factual Background*
#### 1.    *Prosecution's Case*
##### a.    *Accessory to Felony Assault (count 18)*

On August 24, 2011, Robert Navarro, a BPK member, attacked Jaime Vasquez in a 7-Eleven parking lot.  Vazquez was left "covered in blood"; he suffered injuries to his face and went to the emergency room for stitches.  Vasquez reported the attack to police, and a description of the assailant and his vehicle was broadcast to Gilroy police.

Renteria learned of the attacks on a phone call that was captured by a wiretap. Renteria, who had a police scanner in his home, used it to monitor police activity. Thereafter, over a series of phone calls, Renteria called Navarro to advise him about what he was hearing over the police scanner.  Renteria reported to Navarro that "somebody called the cops" to report the assault.  Renteria relayed the description of the assailant and his vehicle, which prompted Navarro to respond, "Oh, shit."  In another phone call, Navarro recounted the attack and asked, "What are they saying at the police station?"

---

[4] The second step of the *Hobbs* inquiry involves determining whether the affidavit "set forth sufficient competent evidence supportive of the magistrate's finding of probable cause . . . ."  (*Hobbs*, *supra*, 7 Cal.4th at p. 975.)  As we discussed, Renteria did not challenge the affidavit's showing of probable cause in the trial court.  Thus, we do not address the second step.

Renteria reported that "[Vasquez] got his family [at the] station" to "make a report." Renteria instructed Navarro to "[b]e cool with the truck" because a similar truck had recently been used in a carjacking. There were two more phone calls in which Navarro and Renteria discussed the assault. Renteria reported that it did not appear that police had Navarro's name, and "they don't say they were looking for anybody."

>    b.    *Sale of Methamphetamine* (*count 21*) *and Marijuana* (*count 23*); *Using a Minor as an Agent to Sell Methamphetamine* (*counts 26 & 30*); *Inducing a Minor to Sell Cocaine* (*count 29*)

In September 2011, Officer Robert Padilla was assigned to the Unified Narcotics Enforcement Team as the primary undercover narcotics agent. Padilla utilized a storefront,[5] in this case an auto repair shop, and made a phone call to Renteria at about 1:00 p.m. on September 14. Padilla said he was "trying to get a little bit of yay [meaning cocaine] or something or some herb [marijuana] to make some side money." Renteria told Padilla, "I can probably, you know, send the word out to some of the guys." Renteria asked if he knew anyone, but Padilla indicated that his only contact, who Renteria knew, "got locked up . . . ." Renteria stated, "I haven't been fucking around like that for a minute." However, Renteria later stated: "I can probably send someone your way. I mean, I might know someone that [is] buying right now and if they give you a call, then that's probably . . . the best I can do for you."

Eleven minutes later, Padilla received a call from "a male individual who identified himself as Jose." Padilla identified "Jose" as Bruce Salgado, the 17-year-old son of Renteria's wife, Melissa Salgado. Bruce was on "probationary status" with BPK and "had not yet been jumped into the gang." Based on his status he was "expected to go show presence on the street and put in work" for the gang. Bruce offered to sell Padilla

---

[5] Padilla described a storefront as "an undercover operation where you utilize some type of business that you wire up with audio/video equipment and you have undercover officers pose as persons buying stolen property, guns, stolen vehicles, narcotics, and so forth."

one-quarter ounce of cocaine for $275. Bruce also said he could get some crystal methamphetamine. Bruce called again seven minutes later to quote a price of $300 for a quarter ounce of crystal methamphetamine, and to offer marijuana for sale. Padilla eventually agreed to buy the crystal methamphetamine. At about 2:00 p.m., approximately an hour after his original phone call with Renteria, Padilla met Bruce in a parking lot. Bruce was accompanied by two men, whom he told to "post up" before Bruce entered Padilla's vehicle and "handed [Padilla] a baggie of marijuana and a baggie of methamphetamine."

Minutes after the drug sale, Bruce called Renteria to report that Padilla "had a strap with him," meaning Padilla had a firearm. Renteria told Bruce to "keep an eye out, make sure no cars are following you or nothing."

Bruce and Padilla traded phone calls and text messages in the following days. Bruce signed his text messages with, " 'X Brown Pride 4' " and a callback number. Two days after the initial purchase, at about 1:35 p.m., Bruce came to the storefront alone and sold Padilla an eighth of an ounce of methamphetamine for $150. At 1:41 p.m., Renteria called Melissa and asked if she "left already." Melissa replied, "Yeah, why? You need me to go back?" Renteria responded, "No. You took Bruce?" Melissa replied, "No." She added, "I took off, I don't know what he's doing inside [the house]." Renteria said, "All right, I'll call him." Melissa asked, "Why?" Renteria replied, "Oh nothing. I just want to see where—if you took him or no." After the methamphetamine sale, Bruce left and returned at approximately 2:00 p.m. and sold Padilla one-half ounce of cocaine for $500. At 2:17 p.m., Bruce called Renteria and told him, "I went right there to that, to the, to the shop." Bruce told Renteria how he had procured some cocaine, and Renteria asked, "Did you take it to him?" Bruce replied, "Yeah, I charged him five."

Testing later confirmed that the substances that Padilla purchased from Bruce were methamphetamine, marijuana, and cocaine. Confirmed net weights were 6.75 grams (methamphetamine), 3.9 grams (methamphetamine) 1.35 grams (marijuana), and 14.14 grams (cocaine).

At around 5:50 p.m. on September 23, 2011, three men dressed "all in black, black beanies, black sweaters, [and] black pants" walked into the courtyard of the Montebello Ridge apartment complex  They proceeded to shoot at an upstairs unit where a Sureño gang member lived.  Two of the perpetrators, one carrying a short-barrel shotgun, fled in a white Cadillac with a getaway driver, while the third fled on foot into a nearby cemetery.

Based on the wiretap, Gilroy police were alerted to a possible impending shooting at the Montebello apartments, with the perpetrators "probably in a white Cadillac and armed with firearms."  One responding officer observed the white Cadillac waiting with the passenger door "open towards the curb," and the driver waiting and "looking nervously to the rear."  Soon thereafter, the officer saw two males "wearing all black clothing" running toward the vehicle, one of whom was carrying "a rifle or a shotgun" as he ran.  The car then sped off "at an extremely high rate of speed . . . ."  Police followed the Cadillac until it stopped in a parking lot.  They then detained and arrested the three occupants.

Police also found and arrested Bruce in the cemetery.  He was sweaty and out of breath, and talking on his cell phone.  Before police asked him any questions, Bruce stated, "Hey, what's this all about?  I'm just leaving flowers for my grandmother.  Why do you guys have me down on the ground and have your guns pointed at me?"

Evidence from the wiretap of Renteria's phone showed that the Montebello shooting was planned in retaliation for an incident that had occurred the day before.  On September 22, 2011, Bruce called Renteria and told him, "The Scraps [meaning Sureños] in Montebello" "just shot at us right now."  Renteria reported that he "didn't hear nothing on the scanner."  Later, another BPK member called Renteria to tell him that Sureños "keep walking back and forth on both sides of the apartments" and "looked like they are

16

pretty thick . . . ." He reported that "we only got one banger and that ain't gonna do nothing if there's hella of them." Renteria replied, "Well, that's all you need" because "if you guys get caught . . . you guys will get them all taken away." The BPK member said he would "try to get a hold of some other homies . . . just to get a quick distraction going on so we can get in there." He asked Renteria to contact another gang member on his behalf. Renteria said he would "text him and see what he says." Renteria then texted that gang member, writing, "The kingz are in need of ur assistance get at them[.]" Guerin, who was monitoring the wiretap, asked several officers to maintain "a presence on Montebello Drive." Bruce later called Renteria to ask "why are the cops right there on Montebello," and whether Renteria was monitoring the scanner. Renteria replied that he was not listening to the scanner at that moment.

On September 23, 2011, Renteria received a call from a BPK member, Christian Renteria (no relation), asking if he had "hear[d] about Bruce getting blasted at and the homies and the homegirl." Renteria replied, "Oh yeah, yeah." Christian asked if he could borrow Renteria's "thing" "so I can go try to do something tonight." Renteria said, "you're going to [have] to leave me a deposit." He then asked what happened to Christian's "thirty-eight," and Christian said he didn't know if "Anthony still ha[d] it. I'm not sure." Christian then said he would "hit up Smokey then" because "he has a thirty-eight special." Renteria later emphasized that "the South siders got to get handled right there at Montebello." Christian told Renteria, "If I do this, check, check out the scanner for me . . . ." Renteria replied, "Yeah, I'm listening to it right now." Near the end of the conversation, Renteria reiterated that "all of the homeboys need to get together and fucking handle that shit right there at Montebello."

Bruce later called Renteria and asked, "could you fucking get a hold of a strap for us? Hey those screechers [meaning Sureños] are right there on Montebello right now." Bruce called again later to ask Renteria to "[t]urn on the scanner," explaining that "those Southsiders are on Montebello and we have . . . a legit car to get away," and "we're

17

gonna have a shotty and a thirty-eight." Renteria replied, "All right." Renteria asked "what kind of car are you in? So I know if they say it." Bruce replied, "a white Cadillac Deville." Renteria told Bruce, "before you go do this," "[e]rase all the numbers you called and erase all your messages." And "[t]ell Smokey too . . . ."

After the shooting, Bruce called Renteria and said, "Hey, Wally, we need to get picked up . . . ." Renteria warned, "The cops are watching you, Bruce." Bruce reported he was "in the cemetery." Renteria instructed Bruce to "[g]o by your mom's [*sic*] thing and put the thing right there behind some flowers." Bruce asked, "What do you mean put the thing there?" Renteria clarified, "Yeah, what do you have with you?" Bruce said that the shotgun and the "other one [were] gone." Renteria then reported that they "got the guy in the white Cadillac," prompting Bruce to exclaim, "Oh my fucking God, dude!" Renteria asked, "Who has . . . the strap?" Bruce replied, "Johnny and Gato. Gato shot with the shotgun and Smokey shot them with . . . the thirty-eight." In another call, Bruce called back to report, "They got me." Renteria told Bruce to "run to [the] back of the Montebello." Bruce responded, "Hey, all I have to say is I was putting flowers in my grandma's things." Renteria replied, "Yeah, that's it. And say, 'I don't know what's going on.' " Renteria concluded, "Erase your numbers! Erase your numbers!"

### d. Offer to Sell Cocaine (count 58)

On August 24, 2011, Guillermo Salinas called Renteria and asked, "[H]ow much is an ounce of coke?" Renteria replied, "probably like [$850]." Salinas said he had someone who "might want one right now." Renteria responded, "Oh, just let me know. You got the [money], we'll go get it."

### e. Offers to Sell Marijuana (counts 39, 59, 60, 64, 67, 73, & 78)

Renteria was heard on the wiretap offering to sell marijuana on seven occasions. The amount of money involved for each offer to sell ranged from $20 to $180, with one offer to sell involving a proposed barter of "a sixteen gig iPod Touch, black."

18

## 2. *Defense Case*

Jesse DeLaCruz testified as a gang expert. DeLaCruz was a former member of the Nuestra Familia and later an associate of the Mexican Mafia. Based on his review of the case, DeLaCruz opined that BPK was a criminal street gang and that Renteria "ha[d] influence," though he was not necessarily a shot-caller. Regarding the drug-related counts, DeLaCruz opined that while counts 21, 23, and 26 were gang-related, "[t]he rest [were] not." He did not offer an opinion as to the non-drug-related counts.

## 3. *Judgment and Sentencing*

In April 2016, the trial court sentenced Renteria to 49 years 4 months in state prison, and Renteria timely filed a notice of appeal case No. H043702. After subsequent proceedings to correct errors in the original abstract of judgment and to resentence on the marijuana-related counts following the passage of Proposition 64,[6] the court ultimately

---

[6] In December 2017, the California Department of Corrections and Rehabilitation (CDCR) informed the trial court of potential errors in count 43 and count 70. Defense counsel, in a later letter addressed to the court, noted that the original abstract incorrectly identified shooting into an inhabited dwelling (§ 246) as the object of the conspiracy count. He also noted that count 70 should reflect a sentence of one year four months, but should not be doubled because the charge was resolved prior to trial as part of a plea agreement that struck the prior strike allegation. The prosecution agreed with defense counsel's assessment of the errors.

In January 2018, Renteria filed a "petition for resentencing pursuant to Health and Safety Code section 11361.8, subdivision (b)." The petition stated that Renteria's convictions for violating Health and Safety Code section 11360, subdivision (a)(2) had been reclassified as misdemeanors under Proposition 64, and he requested that the felony marijuana-related counts be redesignated as misdemeanors. The prosecution agreed that he should be resentenced.

In February 2018, the trial court issued an order correcting the errors identified in the abstract. After making the changes defense counsel identified, the court ordered that the total term on the abstract be reduced from 49 years four months to 48 years. An amended abstract of judgment was then filed. Shortly after the abstract was entered, defense counsel wrote to the court identifying new errors. Count 70 now erroneously reflected 12 years 4 months, instead of 1 year 4 months. In addition, while the abstract correctly reflected a total sentence of 48 years, the second page of the abstract had the wrong sum total. CDCR followed up with a letter to the court identifying the same errors.

19

imposed a sentence of 34 years in prison and entered an amended judgment. The 34-year sentence consists of the following terms, which were doubled based on the prior strike finding: two 12-year terms (with the second term concurrent to the first) for using a minor as an agent to sell methamphetamine (counts 26 & 30); 4 years for inducing a minor to sell cocaine (count 29); 2 years 8 months for offering to sell cocaine (count 58); 2 years for conspiracy to commit assault with a firearm (count 43); 1 year 4 months for participating in a street gang (count 15); 1 year 4 months each for two accessory offenses (counts 18 and 49); 1 year 4 months for offering to sell Oxycontin (count 70); and 6 years concurrent with count 26 for selling methamphetamine (count 21). For the selling or offering to sell marijuana convictions (counts 23, 39, 59, 60, 64, 67, 73, & 78), the court imposed and deemed served concurrent jail terms of 180 days. The court imposed a three-year gang enhancement (§ 186.22, subd. (b)(1)(A)) for count 26, and struck the gang enhancements for all other counts under section 186.22, subd. (g). The court imposed a five-year term for the prior serious felony conviction enhancement (§ 667, subd. (a)), and struck punishment for the two prior prison term enhancements (former § 667.5, subd. (b)) under section 1385.

Renteria timely appealed in case No. H045926 from the amended judgment.

**B.** **Discussion**

*1.* *Sufficiency of the Evidence*

Renteria contends that the evidence was insufficient to convict him of using a minor as an agent to sell methamphetamine (counts 26 & 30). Specifically, he argues that there was no evidence that Bruce, the minor, acted as his agent.

---

In March 2018, the trial court granted the petition to redesignate the marijuana-related offenses and resentenced Renteria as described in the text. After granting the petition, the court issued an amended abstract of judgment. However, the amended abstract failed to reflect the redesignation of the marijuana-related offenses. Renteria later filed an ex parte motion to correct a clerical error in the abstract of judgment. The trial court thereafter issued what is now the operative amended abstract of judgment, reflecting a sentence of 34 years in prison.

20

Our standard of review is well established. "We ' "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' [Citations.] We presume ' "in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." [Citation.] This standard applies whether direct or circumstantial evidence is involved.' [Citation.]" (*People v. Prince* (2007) 40 Cal.4th 1179, 1251.)

Health and Safety Code section 11380 prohibits "the use of a minor as agent" by an adult to furnish certain controlled substances, including methamphetamine. Although Health and Safety Code section 11380 does not define "agent," "[i]t is a well-recognized rule that for purposes of statutory construction, the codes are to be regarded as blending into each other and constituting but a single statute." (*People v. Vassar* (1962) 207 Cal.App.2d 318, 322.)

Civil Code section 2295 defines "[a]n agent [as] one who represents another, called the principal, in dealings with third persons. Such representation is called agency." "Actual agency typically arises by express agreement. [Citations.] It also 'may be implied from the conduct of the parties. [Citation.]' [Citation.]" (*Van't Rood v. County of Santa Clara* (2003) 113 Cal.App.4th 549, 571.)

In this case, the jury could reasonably conclude from all the circumstances that Renteria authorized Bruce to act as his agent during both methamphetamine sales. Padilla initially called Renteria to inquire about purchasing drugs. Eleven minutes after Renteria told Padilla that he could "probably send someone your way," Bruce called Padilla and offered to sell him methamphetamine and cocaine. The sale of methamphetamine was consummated about an hour later. Immediately after the sale, Bruce called Renteria to report the success of the transaction, and Renteria instructed him to "make sure no cars are following you or nothing." At the time, Bruce was on "probationary status" with BPK and was expected to "put in work" for the gang. On this

21

basis, the jury could reasonably find that Bruce was authorized to act as Renteria's agent for purposes of selling methamphetamine.

In addition, the jury could also reasonably infer that Renteria continued to authorize Bruce to act for him when Bruce again sold methamphetamine two days later. Based on the close proximity in time between the two transactions, it was reasonable to infer that Bruce continued to act as Renteria's agent for the subsequent transaction. For instance, at about the same time the second methamphetamine transaction was occurring, Renteria called Melissa (Bruce's mother) to ask if she "took Bruce?" She replied that she "took off," and "d[id]n't know what he's doing inside." Later, after the subsequent cocaine sale, Bruce called Renteria to tell him he had completed a sale of cocaine. The jury could reasonably infer that Renteria's call to his wife when the transaction occurred demonstrated knowledge and involvement in the planned drug transaction, including when and where it was taking place. In addition, Bruce's phone call to Renteria supported the inference that the methamphetamine transaction had been planned. Bruce reported that he had procured and sold cocaine to Padilla, but did not mention the methamphetamine. The jury could reasonably infer that the methamphetamine sale was already known to Renteria. In sum, the evidence supported a rational inference that Bruce continued to act as Renteria's agent for the second methamphetamine transaction.

Renteria suggests that he merely made a referral to Bruce, and that his advice that Bruce "make sure" he was not being followed simply reflected a desire that Bruce avoid arrest. While this interpretation may be a *conceivable* construction of the facts, the evidence does not demand it. " ' " '[T]he opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " [Citations.]' [Citation.]" (*People v. Stanley* (1995) 10 Cal.4th 764, 792-793.) Because the jury could reasonably find that Bruce was acting as Renteria's agent during the two methamphetamine transactions, substantial evidence supports the convictions for using a minor as an agent to sell methamphetamine.

22

### 2. *CALCRIM No. 2383*

Renteria argues that the trial court prejudicially erred because the jury instruction on agency was inadequate and failed to "teas[e] out the precise nature of the principal-agent relationship."

#### a. *Background*

The trial court gave the jury CALCRIM No. 2383 [Use of Minor as Agent to Violate Controlled Substance Law]. The instruction stated: "The defendant is charged in Counts 26, 30 with using someone under 18 years of age as an agent to sell methamphetamine, a controlled substance in violation of Health and Safety Code section 11380(a). [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant used Bruce Salgado as an agent; [¶] 2. Bruce Salgado was used by the defendant to sell a controlled substance; [¶] 3. The controlled substance was methamphetamine; [¶] 4. At that time, the defendant was 18 years of age or older; [¶] 5. At that time, Bruce Salgado was under 18 years of age; [¶] AND [¶] 6. The defendant knew of the substance's nature or character as a controlled substance." Relevant to the appeal, the instruction stated: "An agent is a person who is authorized to act for the defendant in dealings with other people."

During closing argument, defense counsel noted that CALCRIM No. 2383 "contains its own definition of an agent." He continued: "And that is, 'An agent is a person who is authorized to act for the defendant in dealings with other people.' Pretty much a common understanding of what an agent is." Defense counsel proceeded to argue that there was insufficient evidence that Bruce was Renteria's agent for the two methamphetamine sales.

#### b. *Analysis*

" 'A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' [Citations.]" (*People v. Landry* (2016) 2 Cal.5th 52, 99-100.) Nevertheless, "[a] reviewing court may review an instruction even absent an objection 'if the substantial rights of the defendant were affected thereby.'

23

[Citation.]" (*People v. Hardy* (2018) 5 Cal.5th 56, 91.) " 'Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim—at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was.' [Citation.]" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1087.) Here, because Renteria invokes his federal constitutional rights to argue that review is warranted, we will review his claim of error notwithstanding his failure to request a modification.

In this case, we need not decide whether the trial court's instruction was inadequate in explaining the principal-agent relationship because the record in this case establishes that the instruction's failure to include language defendant now suggests should have been included was not prejudicial to Renteria's defense.

This type of instructional error claim is reviewed under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). (*People v. Lucas* (2014) 60 Cal.4th 153, 289, disapproved on another ground in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53-54, fn. 19.) Reversal is required "only when . . . it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson*, *supra*, at p. 836.) " ' " '[A] "probability" in this context does not mean more likely than not, but merely a *reasonable chance*, more than an abstract *possibility*.' [Citation.]" ' [Citation.]" (*People v. Wilkins* (2013) 56 Cal.4th 333, 351).)

As given, CALCRIM No. 2383 required the jury to find that Renteria "used" Bruce as an agent to sell methamphetamine and that Bruce was "authorized to act . . . in dealings with other people." Renteria contends that the instruction failed to require that: (a) the jury find that he " 'manifest[ed] assent' " that Bruce act as his agent; (b) Bruce was subject to Renteria's control; and (c) that the minor "had to manifest his own assent to be under [Renteria's] control." These additional requirements, however, were of virtually no value to the defense because the unchallenged evidence presented by the prosecution at trial established that these principles of agency were satisfied. First, Renteria manifested his assent that Bruce act as his agent when he told Padilla he would "send someone your way" and then sent Bruce to Padilla. Second, Bruce demonstrated

24

he was under Renteria's control by meeting Padilla, and by calling Renteria after the drug transactions to report on the sale. Finally, the evidence showed that Bruce had assented to being under Renteria's control. Bruce was on probationary status with BPK and he sought full status as a member. Renteria was a "shot caller" for BPK. By seeking full status as a member of a group led by Renteria, Bruce manifested his own asset to Renteria's control.

Had the jury been instructed as Renteria urges, it is not reasonably probable that the result would have been different. (*Watson*, *supra*, 46 Cal.2d at 836.) Thus, we find that the alleged instructional error does not merit reversal of the judgment.

### 3. CALCRIM No. 1401

Renteria argues that the trial court prejudicially erred by failing to give a requested modified version of CALCRIM No. 1401. Renteria seeks reversal of the gang enhancement findings for the counts of offering to sell marijuana (counts 39, 58, 59, 60, 64, 73, & 78), and the gang enhancement finding for one count of offering to sell cocaine (count 58) based on the court's failure to give his requested instruction.

### a. Background

In relevant part, the trial court instructed the jury with CALCRIM No. 1401 [Felony or Misdemeanor Committed for Benefit of Criminal Street Gang]: "If you find the defendant guilty of any of the crimes charged, you must then decide whether the People have proved the additional allegation that the defendant committed that crime for the benefit of, at the direction of, or in association with a criminal street gang. You must decide whether the People have proved this allegation for each crime and return a separate finding for each crime. [¶] To prove this allegation, the People must prove that: [¶] 1. The defendant committed the crime for the benefit of, at the direction of, or in association with a criminal street gang; [¶] AND [¶] 2. The defendant intended to assist, further, or promote criminal conduct by gang members."

Renteria requested that the following language, which was based on *People v. Albillar* (2010) 51 Cal.4th 47 (*Albillar*), be added: " 'Not every crime committed by a gang member is related to a gang. The phrase 'in association with a criminal street gang'

25

as used in subparagraph 1 means that the defendant came together as gang members with other members of his gang in order to commit the crime, in the sense that he and the other gang members knew they could rely on one another and that the other gang members would back up the defendant and assist him in committing the crime.' "

The trial court denied the request. The court stated that it "felt that there was no explanation, further explanation necessary other than what's contained in the CALCRIM instruction as to the definition of or the requirement for the jury to find the gang allegation."

### b. Analysis

" 'Under appropriate circumstances, "a trial court may be required to give a requested jury instruction that pinpoints a defense theory of the case . . . ." ' " (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 220.) Pinpoint instructions " 'relate particular facts to a legal issue in the case or "pinpoint" the crux of a defendant's case.' " (*People v. Gutierrez* (2009) 45 Cal.4th 789, 824.) Parties are entitled to "legally correct and factually warranted pinpoint instructions designed to elaborate and clarify other instructions," should they request such additional instruction. (*People v. Hughes* (2002) 27 Cal.4th 287, 362.) However, a trial court may properly refuse to give a pinpoint instruction that "incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not supported by substantial evidence." (*People v. Moon* (2005) 37 Cal.4th 1, 30.)

"We review a claim of instructional error de novo." (*People v. Fiore* (2014) 227 Cal.App.4th 1362, 1378.) "Whether or not the trial court should have given a 'particular instruction in any particular case entails the resolution of a mixed question of law and fact,' which is 'predominantly legal.' [Citation.] As such, it should be examined without deference." (*People v. Hernandez* (2013) 217 Cal.App.4th 559, 568.)

In arguing that CALCRIM No. 1401 is incomplete or misleading, Renteria relies primarily on *Albillar*. Renteria's reliance on *Albillar* is misplaced. In *Albillar*, our high court considered the sufficiency of the evidence supporting gang enhancements (§ 186.22, subd. (b)(1)) for three gang members who were convicted of sexually

26

assaulting the victim in concert. (*Albillar*, *supra*, 51 Cal.4th at pp. 51-54, 59-63.) In its analysis, the court observed that "[n]ot every crime committed by gang members is related to a gang." (*Id.* at p. 60.) The court concluded, however, that there was "substantial evidence that defendants came together *as gang members* to attack [the victim] and, thus, that they committed these crimes in association with the gang." (*Id.* at p. 62.) In reaching this conclusion, the court reasoned that each defendant could "rely on the others' cooperation in committing the offenses," could " 'count[] on each other's loyalty to be there and [to] back them up,' " could trust that gang bonds and the gang's "internal code" " 'would keep people from ratting on their own gang,' " and could rely on the gang's intimidating reputation to deter the victim and her friends from reporting the crime. (*Id.* at pp. 61-62.)

"Language in an appellate opinion which may be a good statement of law or of the reasoning of the appellate court does not necessarily make a good jury instruction." (*People v. Adams* (1987) 196 Cal.App.3d 201, 204-205.) "The reviewing court generally does not contemplate a subsequent transmutation of its words into jury instructions and hence does not choose them with that end in mind." (*People v. Colantuono* (1994) 7 Cal.4th 206, 221 fn. 13.) Thus, language intended to " 'guide[] appellate courts in conducting sufficiency-of-evidence review' " of particular jury findings is not necessarily intended " 'to constrain juries in making such findings.' " (*People v. Steele* (2002) 27 Cal.4th 1230, 1254.)

Here, the requested instruction was unnecessary and misleading. *Albillar* did not consider the adequacy of instructions on "gang association." Rather, it set out to describe what factors *specific to the facts of that case* fulfilled the "in association with a criminal street gang" element of the gang enhancement statute. It did not purport to provide a new definition of that phrase, or set forth a comprehensive and exclusive list of factors defining the phrase. Thus, Renteria's proposed pinpoint instruction was misleading in suggesting that the factors identified in *Albillar* were required to find that a crime was committed "in association with a criminal street gang." Accordingly, the trial court was not obligated to give Renteria's requested instruction.

### 4. Lesser-Included Offense Instructions

Renteria argues that the trial court prejudicially erred by failing to give instructions on assault and battery as lesser included offenses of count 18 (accessory to assault by force likely to cause great bodily injury).

### a. Background

For count 18, Renteria was charged with being an accessory to Navarro's commission of assault by force likely to produce great bodily injury. The trial court instructed the jury with CALCRIM No. 440 [Accessories]: "The defendant is charged in Counts 18, 20 and 49 with being an accessory to a felony in violation of Penal Code section 32. [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. Another person, whom I will call the perpetrator, committed a felony; [¶] 2. The defendant knew that the perpetrator had committed a felony or that the perpetrator had been charged with or convicted of a felony; [¶] 3. After the felony had been committed, the defendant either harbored, concealed, or aided the perpetrator; [¶] AND [¶] 4. When the defendant acted, he intended that the perpetrator avoid or escape arrest, trial, conviction, or punishment." The court identified the felony relevant to count 18 as assault by force likely to produce great bodily injury, and instructed the jury on the elements of that offense.

Renteria requested that the trial court give an instruction on battery "not as a lesser-included offense . . . but, rather, so I could explain to the jury why, in [c]ount 18, the assault that was committed by Robert Navarro was only a misdemeanor and not a felony." The trial court refused, stating that its duty was "to instruct on the crimes that are alleged, and battery is not an alleged crime in this matter." The court further stated that it "will not preclude you from arguing to the jury that it was a simple battery or a misdemeanor, but I think most people know what a battery is without the instruction." The court added: "It's not being offered as a lesser-included offense; therefore, it's not appropriate to instruct the jury on, but [because the underlying offense is a wobbler] you're free to argue the misdemeanor" or "that the assault . . . based on the nature of the injury, was not great bodily injury."

28

### b. *Analysis*

"California law requires a trial court, sua sponte, to instruct fully on all lesser necessarily included offenses supported by the evidence." (*People v. Breverman* (1998) 19 Cal.4th 142, 148-149.) An offense is a lesser included offense to a charged offense if the former is necessarily included in the latter. There are two tests to determine whether this is so: (1) if all of the elements of the lesser offense are included in the elements of the greater offense, or (2) if the allegations of the pleading describe the charged offense so that it necessarily includes all the elements of the lesser offense. (*People v. Lopez* (1998) 19 Cal.4th 282, 288-289.)

Section 32 provides, in relevant part: "Every person who, after a felony has been committed . . . aids a principal in such felony, with the intent that said principal may avoid or escape from arrest . . . having knowledge that said principal has committed such felony . . . is an accessory to such felony." Battery is defined as "any willful and unlawful use of force or violence upon the person of another." (§ 242.) Assault is defined as "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.) Under the elements test, simple assault and battery are not included in the elements of accessory to a felony. In addition, the pleading alleged that Renteria aided Navarro to evade arrest for a felony; it did not allege Renteria committed simple assault and battery. Thus, under the accusatory pleading test, those crimes were not included in count 18. Because battery and assault were not lesser included offenses, the court had no duty to instruct on simple assault and battery as lesser included offenses of accessory to commission of a felony.

Renteria argues that not instructing on the lesser included offense violates equal protection principles because it treats defendants charged as accessories after the fact differently from principals. "A defendant claiming that state legislation violates equal protection principles must first demonstrate that the laws treat persons similarly situated in an unequal manner." (*People v. Timms* (2007) 151 Cal.App.4th 1292, 1302.) Renteria and Navarro, however, were not similarly situated. Navarro was charged with felony assault as the perpetrator. Renteria, on the other hand, was charged with being an

29

accessory after the commission of the crime. Renteria is culpable not for the assault, but for acting with the intent to help the perpetrator avoid punishment for a felony. Put another way, the offenses share little in common, having differing elements, intents, sentences, and purposes. Renteria has thus failed to make the threshold showing for an equal protection claim that someone charged as an accessory is similarly situated to the perpetrator of the subject felony.

### 5. Cumulative Error

Renteria contends that the cumulative impact of the errors discussed above rendered the trial fundamentally unfair. We have rejected each of Renteria's individual claims of error, except for one claim of instructional error, where we found no prejudice even if error was assumed. Because there is no prejudice to cumulate, we reject Renteria's claim of cumulative error. (*People v. Watkins* (2012) 55 Cal.4th 999, 1036.)

### 6. Section 654: Counts 21, 23, 26, and 30

Renteria argues that his sentences for counts 21 (sale of methamphetamine), 23 (sale of marijuana), and 30 (using a minor to sell methamphetamine) should have been stayed pursuant section 654. He contends that these offenses are based on the same act that was punished in count 26 (using a minor to sell methamphetamine).

#### a. Background

Renteria argued in the trial court that the sentences for counts 21, 23, and 30 should be stayed under section 564 because "those counts embrace the exact same conduct as resulted in conviction on [c]ount 26 . . . ." He contended counts 21, 23, 26, and 30 were essentially founded on the same single act—his referral of Bruce to Padilla—and therefore the counts punished the "same act in different ways." At sentencing, the court did not stay the terms imposed for any of these counts under section 654.

#### b. Analysis

Section 654, subdivision (a) provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or

omission be punished under more than one provision." This section prohibits multiple punishments for a single physical act that violates different provisions of law. (*People v. Jones* (2012) 54 Cal.4th 350, 358.) Under this rule, a trial court may not impose concurrent terms for multiple convictions based on the same act; rather, one or more terms must be stayed. (*Id.* at p. 353.)

"Whether a defendant will be found to have committed a single physical act for purposes of section 654 depends on whether some action the defendant is charged with having taken separately completes the actus reus for each of the relevant criminal offenses." (*People v. Corpening* (2016) 2 Cal.5th 307, 313 (*Corpening*).) An "act or omission" under section 654 also includes a course of conduct consisting of multiple acts if the defendant acted with a single objective. (*Neal v. State of California* (1960) 55 Cal.2d 11, 18, disapproved on another ground in *People v. Correa* (2012) 54 Cal.4th 331, 334; *People v. Beamon* (1973) 8 Cal.3d 625, 639.) "Whether a defendant may be subjected to multiple punishment under section 654 requires a two-step inquiry, because the statutory reference to an 'act or omission' may include not only a discrete physical act but also a course of conduct encompassing several acts pursued with a single objective. [Citations.] We first consider if the different crimes were completed by a 'single physical act.' [Citation.] If so, the defendant may not be punished more than once for that act. Only if we conclude that the case involves more than a single act—i.e., a course of conduct—do we then consider whether that course of conduct reflects a single ' "intent and objective" ' or multiple intents and objectives." (*Corpening*, *supra*, at p. 311.)

"Whether multiple convictions are based upon a single act is determined by examining the facts of the case." (*People v. Mesa* (2012) 54 Cal.4th 191, 196.) "A trial court's express or implied determination that two crimes were separate, involving separate objectives, must be upheld on appeal if supported by substantial evidence." (*People v. Brents* (2012) 53 Cal.4th 599, 618.) "We review the trial court's findings 'in a light most favorable to the respondent and presume in support of the order the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]' [Citation.]" (*People v. Green* (1996) 50 Cal.App.4th 1076, 1085.)

31

Renteria's argument rests on the presumption that all four of the challenged offenses were based on a single physical act—that is, "Renteria called [Bruce] to let him know of a potential drug sale with Officer Padilla." This argument lacks merit. "A principal in the commission of a crime is one who directly commits the crime or who aids and abets the perpetrator." (*In re Michael T.* (1978) 84 Cal.App.3d 907, 910; § 31.) "[P]roof of aider and abettor liability requires proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus— conduct by the aider and abettor that in fact assists the achievement of the crime." (*People v. Perez* (2005) 35 Cal.4th 1219, 1225.)

In this case, given Renteria's peripheral conduct with respect to the actual drug transactions, Renteria's criminal liability for counts 21, 23, 26, and 30 was based on an aiding and abetting theory. However, contrary to Renteria's argument, his conduct that in fact assisted the achievement of the crimes consisted not of a single act, but at least two distinct acts. In Renteria's initial phone conversation, he discussed Padilla's request for cocaine and marijuana. Renteria stated that he could "send the word out to some of the guys" about Padilla's request. This phone conversation constituted the first act in support of the achievement of the crimes. The evidence showed that 11 minutes later, Bruce called Padilla. Although there was no direct evidence of what was said or how it was said, in the time between Renteria's conversation with Padilla and Bruce's phone call with Padilla, Renteria must have somehow communicated to Bruce about Padilla's request for drugs. This communication constituted the second distinct physical act in support of the crimes. Under the two-step inquiry described in *Corpening*, because this case involves more than a single physical act, we must now "consider whether [the] course of conduct reflects a single ' "intent and objective" ' or multiple intents and objectives." (*Corpening*, *supra*, 2 Cal.5th at p. 311.)

In this case, the trial court sentenced Renteria to concurrent six-year terms for the sale of methamphetamine (count 21) and sale of marijuana (count 23), which occurred

during the same transaction. In so doing, the court impliedly found that Renteria had multiple intents and objectives for the offenses. Substantial evidence supports this finding. When Renteria first spoke to Padilla, Padilla said he wanted "to make some side money." Bruce later offered a quarter ounce of crystal methamphetamine for $300 and eventually an eighth of an ounce of marijuana. Based on the quantity of methamphetamine, and Padilla's expressed interest in "mak[ing] some side money," the court could reasonably find that the purpose and intent of the methamphetamine sale was to establish Padilla as a distributer. The quantity of marijuana offered for sale, however, was less suggestive of distribution, and so the court could reasonably find that the purpose and intent of that sale was simply for Padilla to make money from the sale of drugs.

As for using a minor as an agent to sell methamphetamine (counts 26 & 30), substantial evidence also supports the trial court's implied finding that Renteria harbored a separate objective from the other drug counts. As we discussed, the evidence supported a finding that the objective of the methamphetamine sale was to establish a distribution channel. The evidence also showed that Bruce was not yet a member of BPK, that he was on probation, and that he was working toward full membership. The trial court could reasonably find from this evidence that Renteria's objective in using a minor to sell methamphetamine was to provide experience and training to Bruce so that he could eventually become a full member of BPK. Thus, section 654 did not bar multiple sentences for the challenged convictions.[7]

> 7. *Section 654: Counts 43 and 49*

Renteria argues that the trial court erred in imposing consecutive sentences on counts 43 (conspiracy to commit assault with a firearm) and count 49 (accessory after the fact to shooting at an occupied building). He argues that punishment for count 49 was

---

[7] Renteria also asserts that the trial court's misapplication of sentencing laws violates his state constitutional and federal due process rights. Because there was no misapplication of state law, Renteria has shown no violation of state constitutional or federal due process rights.

prohibited by section 654 because "[h]is role as a conspirator and as an accessory after the fact involved a single course of conduct and a unitary intent."

### a. Background

Renteria requested that the term imposed for count 49 be stayed pursuant to section 654. He argued that the conduct involved in count 49 represented a "continuous course of action" that "prevents the imposition of an unstayed sentence . . . ."

The trial court denied the request, stating: "[A]s to count 49, although it occurred on the same day, I don't agree with you that it's one in the same crime. Count 43 relates to the conspiracy to commit the shooting which was totally separate from being an accessory after the fact when he was directing the individuals and helping them to try to avoid police contact, especially with regard to his step son, [Bruce]. I think that it is a totally separate thing from the conspiracy itself . . . ."

### b. Analysis

Here, in sentencing Renteria for both counts 43 and 49, the trial court impliedly found that Renteria harbored a separate objective for each offense. Substantial evidence supports this finding. The evidence showed that Bruce called Renteria to tell him that Sureños "in Montebello" "just shot at us right now." Renteria received another report from another BPK member who told him there were Sureños "on both sides of the apartments" and it "looked like they [were] pretty thick." This BPK member told Renteria he needed more people and asked Renteria to contact another BPK member. Renteria agreed and sent a text message that "[t]he kingz are in need of ur assistance . . . ." Renteria continued to field phone calls and text messages leading up to the shooting. Thus, the wiretap evidence showed that Renteria was intimately involved in the planning and execution of the attack, including procuring people and weapons. Therefore, the trial court could reasonably find that the objective of the conspiracy was accomplished when the shooting actually occurred.

The trial court could also reasonably find that the objective of the accessory offense was to assist Bruce in evading capture after it became apparent that police had arrested the other participants and were closing in on Bruce. The evidence showed that

34

Renteria gave Bruce detailed instructions on where to flee ("run to [the] back of the Montebello."), what to say to police ("[g]o by your mom's [*sic*] thing and put the thing right there behind some flowers," and say, " 'I don't know what's going on' "), and how to destroy evidence ("Erase your numbers!  Erase your numbers!").  Viewing the evidence and the reasonable inferences in the light most favorable to the court's finding, we conclude that substantial evidence supports the trial court's determination that the two crimes had separate objectives.  Thus, the court did not err in imposing separate terms for counts 43 and 49.

### 8. *Failure to Dismiss Prior Strike Finding*

Renteria argues that the trial court abused its discretion by failing to dismiss the prior strike finding.

### a. *Background*

At Renteria's initial sentencing in 2016, Renteria requested that the court exercise its discretion to dismiss the prior strike finding.  In light of the probation officer's recommended sentence of nearly 52 years, he noted that at 41 years of age, even if he served only 80 percent of the sentence he "would be a very old man on his out date, if he even survives that long."  He asserted that he was "facing a double whammy" because he was "technically a second striker, not because he has previously been convicted of a violent offense, or even an offense normally listed as a serious offense, but rather because [he was convicted] of a status offense – . . . sec. 12021(a) – [and] accepted a gang allegation.  Then, because the law requires that most of the subordinate counts be run consecutively to the principal count, and because the wiretap has resulted in convictions on so many drug charges, even though most of them are simply offers to sell small amounts of marijuana and other controlled substances, the recommended sentence ends up being five decades."  He asserted this was "very wrong" and "far beyond what the voters of California thought they were doing when they voted to accept the [T]hree [S]trikes law in 1992."  He also asserted that the sentence "amount[ed] to cruel and unusual punishment within the meaning of the" federal and state constitutions.

35

The trial court declined to dismiss the strike finding: "[F]irst of all, I looked at all of the factors involved here, which I should consider pursuant to [*People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*)] and [*People v. Williams* (1998) 17 Cal.4th 148 (*Williams*)]. And that is, the nature of the current charges, the age of the strike, the prospects, and the history of the defendant, and all of those things, character and background. [¶] I find that the present offense, at least a portion of it . . . is violent in that it was a conspiracy to commit a shooting at an occupied dwelling. The prior strike is only four years old and was a serious felony for which Mr. Renteria went to prison. [¶] He was on misdemeanor probation at the time that these offenses were committed for which he's been convicted. There was a weapon involved in that one count. Actually, more than one weapon involved and, also, in the prior conviction. [¶] His prior performance on probation and parole has not been good. We're dealing with a substantial quantity of drugs. Although, each of the drug counts may have involved relatively small amounts of drugs, when you look at the totality, we're dealing with a substantial amount of drugs that was being dealt with by Mr. Renteria. [¶] I also think his prospects are poor. You know, I know that he's indicated that he has plans in the future and whatnot, and I took that into consideration somewhat in the sentencing part of it, but as far as the *Romero* part of it, he's continued in his gang lifestyle and, therefore, I think that, based upon his character, background, and everything, the prospects are not good."

The court concluded: "Based on all of these reasons, I cannot say that Mr. Renteria clearly falls outside the spirit of the [T]hree [S]trikes law so the motion to dismiss the strike is denied. [¶] As to your other argument with regard to the cruel and unusual punishment argument, all I can say to that is, first of all, the law is the law. And based on the prior strike and the different dates that these matters were committed, it's mandatory consecutive sentencing as you know. Some of them, the offenses that are charged that occurred on the same date, as you can see from the probation report, are running concurrent, and I have no problem with that. [¶] I will note, also, that when you say the Court could fashion some sentence that is less than what is recommended by

36

probation, I don't view my job as fashioning sentences to suit the defendant in a particular case. [¶] And your argument that it's cruel and unusual, while it may be more than what you would expect for a normal drug case, we're dealing with all of these charges."

The court then stated it intended to follow the probation officer's "very generous" recommendation to stay the gang enhancements on all counts except count 26, the principal term, and to impose the midterm instead of the upper term on that count. The court emphasized that "the law requires consecutive sentencing on all of these convictions that were on different dates because of the strike," and "while it seems like a lot, I think that the sentence recommendation is reasonable under all of the circumstances."

### b.    Analysis

Renteria takes issue with the trial court's statement, with respect to his cruel and unusual argument, that "the law is the law." The court further stated that based on the "prior strike and the different dates that these matters were committed, it's mandatory consecutive sentencing as you know." The court added, "I don't view my job as fashioning sentences to suit the defendant in a particular case." Renteria contends that "[t]he court's reason [here] for denying the *Romero* motion was an abuse of discretion." He suggests that the trial court misunderstood the scope of its discretion to dismiss his strike prior.

"[A]n abuse of discretion occurs where the trial court was not 'aware of its discretion' to dismiss" a prior strike finding. (*People v. Carmony* (2004) 33 Cal.4th 367, 378 (*Carmony*).) Looking at the trial court's comments in context, however, we do not believe that these remarks indicate that it misunderstood the scope of its authority. In fact, in making its ruling, the trial court made clear at the outset that it had considered "all of the factors involved here," which included "the nature of the current charges, the age of the strike, the prospects, and the history of the defendant, and all of those things, character and background." The court then expounded on the individual factors before concluding that "based upon [Renteria's] character, background, and everything, the

prospects are not good." The court's language reflects a thoughtful consideration of the factors a court must consider when ruling on a motion to dismiss a prior strike finding under the Three Strikes law. (*Williams*, *supra*, 17 Cal.4th at p. 161 [a court "must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies . . . ."].)

Taken in their entirety, the trial court's remarks demonstrate that it properly understood that a "court's discretion to strike prior felony conviction allegations in furtherance of justice is limited" (*Romero*, *supra*, 13 Cal.4th at p. 530), and that "no weight whatsoever may be given to factors extrinsic to the [Three Strikes] scheme . . . ." (*Williams*, *supra*, 17 Cal.4th at p. 161.) "[A] primary purpose of the Three Strikes law was to restrict judicial discretion" (*People v. Garcia* (1999) 20 Cal.4th 490, 501), and "the [T]hree [S]trikes law not only establishes a sentencing norm, it carefully circumscribes the trial court's power to depart from this norm and requires the court to explicitly justify its decision to do so" (*Carmony*, *supra*, 33 Cal.4th at p. 378). We therefore reject Renteria's contention that the trial court misunderstood the scope of its discretion to dismiss the strike finding and thereby abused its discretion.

### 9. *Prior Prison Term Enhancements*

Renteria argues that under amended section 667.5, subdivision (b), his prison prior enhancements should be stricken because neither of his prior convictions was for a sexually violent offense. The Attorney General agrees that "[e]ven though the court did not impose any additional punishment . . . for the two prison priors, the prison prior allegations and findings are no longer authorized."

The trial court found true allegations that Renteria had served two prior prison terms for felony firearm possession (§ 12021, subd. (a)(1)) and possession for sale of a controlled substance (Health & Saf. Code, § 11378). The sentences for both enhancements were stayed pursuant to section 1385.

38

Effective January 1, 2020, Senate Bill No. 136 (2019-2020 Reg. Sess.) (Senate Bill 136) amended section 667.5, subdivision (b) to limit the one-year enhancement for a prior prison term so that it will apply only where the offense underlying the prior prison term was a sexually violent offense as defined in Welfare and Institutions Code section 6600, subdivision (b). (Stats. 2019, ch. 590, § 1; § 667.5, subd. (b).) Under *In re Estrada* (1965) 63 Cal.2d 740, "[w]hen the Legislature has amended a statute to reduce the punishment for a particular criminal offense, we will assume, absent evidence to the contrary, that the Legislature intended the amended statute to apply to all defendants whose judgments are not yet final on the statute's operative date. [Citation.]" (*People v. Brown* (2012) 54 Cal.4th 314, 323, fn. omitted.) We find nothing in Senate Bill 136 that suggests a legislative intent that the amendments to section 667.5, subdivision (b) apply only prospectively. Therefore, it is appropriate to infer, as a matter of statutory construction, that the Legislature intended the amended version to apply to all cases to which it could constitutionally be applied. (*People v. Conley* (2016) 63 Cal.4th 646, 657.)

Here, Renteria's case was not final on January 1, 2020. (*People v. Vieira* (2005) 35 Cal.4th 264, 306 (*Vieira*).) The record reflects that Renteria's prior prison terms were for felony possession of a firearm and possession for sale of a controlled substance. Because the prior prison terms were not served for a sexually violent offense, Renteria's section 667.5, subdivision (b) enhancements are now unauthorized under the amended statute and should be stricken, not stayed.

### 10. *Prior Serious Felony Enhancement*

Defendant contends that his case should be remanded to allow the trial court to exercise its discretion to strike the section 667, subdivision (a) enhancement in light of recently enacted Senate Bill No. 1393 (2017-2018 Reg. Sess.) (Senate Bill 1393), (Stats. 2018, ch. 1013, § 1).

The trial court imposed a five-year enhancement term based on Renteria's prior serious felony conviction for possession of a firearm with a gang enhancement. At the time of sentencing, the trial court was required to impose a five-year consecutive term

under section 667, subdivision (a) when a prior serious felony conviction enhancement was found true under that provision. (Former § 667, subd. (a).) "On September 30, 2018, the Governor signed Senate Bill 1393 which, effective January 1, 2019, amend[ed] sections 667[, subdivision] (a) and 1385[, subdivision] (b) to allow a court to exercise its discretion to strike or dismiss a prior serious felony conviction for sentencing purposes. (Stats. 2018, ch. 1013, §§ 1-2.)" (*People v. Garcia* (2018) 28 Cal.App.5th 961, 971 (*Garcia*).) Under *Estrada*, because nothing in Senate Bill No. 1393 suggests a legislative intent that the amendments to sections 667, subdivision (a), and 1385, subdivision (b), apply only prospectively, "it is appropriate to infer, as a matter of statutory construction, that the Legislature intended Senate Bill 1393 to apply to all cases to which it could constitutionally be applied, that is, to all cases not yet final when Senate Bill 1393 bec[a]me[] effective on January 1, 2019. [Citations.]" (*Garcia*, *supra*, 28 Cal.App.5th at p. 973.)

Here, Renteria's case was not final on January 1, 2019. (*Vieira*, *supra*, 35 Cal.4th at 306.) The record does not " 'clearly indicate[ ]' " whether the trial court would have decided to strike the prior serious felony conviction enhancement had it been apprised that it had such discretion. (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.) The Attorney General concedes that defendant's case should be remanded. We agree that a remand is required.

## III. DISPOSITION

As to Solins case No. H041399 and Regalado case No. H042671, the judgments are affirmed. As to Renteria case Nos. H043702 and H045926, the judgment is reversed. On remand, the trial court is directed to strike the prior prison term enhancements and to exercise its discretion as to whether to strike Renteria's prior serious felony conviction enhancement. If the court strikes this enhancement, it shall resentence defendant. If not, it shall prepare an amended abstract of judgment deleting the prison prior enhancements and forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.

_____

ELIA, ACTING P.J.

WE CONCUR:

_____

BAMATTRE-MANOUKIAN, J.

_____

GROVER, J.

*People v. Solins*
H041399
*People v. Regalado*
H042671
*People v. Renteria*
H043702, H045926